**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RENO AIR RACING ASSOCIATION,
INC.,
              *Plaintiff-Appellee,*

          v.

JERRY MCCORD,
              *Defendant-Appellant.*

No. 04-16001

D.C. No.
CV-02-00474-HDM

OPINION

Appeal from the United States District Court
for the District of Nevada
Howard D. McKibben, District Judge, Presiding

Argued and Submitted
February 14, 2006—San Francisco, California

Filed July 7, 2006

Before: Arthur L. Alarcón and M. Margaret McKeown,
Circuit Judges, and H. Russel Holland,* District Judge.

Opinion by Judge McKeown:

---

*The Honorable H. Russel Holland, Senior United States District Judge
for the District of Alaska, sitting by designation.

## COUNSEL

Jeanne Collachia, Winnetka, California, for the defendant-appellant.

Matthew D. Francis, Watson Rounds, Reno, Nevada, for the plaintiff-appellee.

## OPINION

McKEOWN, Circuit Judge:

Jerry McCord appeals the district court's decision and final judgment following a bench trial. The district court entered an award of damages and a permanent injunction against McCord due to his infringement of two trademarks belonging to Reno Air Racing Association, Inc. ("Reno Air"), in violation of the Lanham Act of 1946, 15 U.S.C. §§ 1051 *et seq.* ("Lanham Act"). In addition, the district court found McCord in civil contempt and imposed sanctions based on his viola-

tion of an ex parte temporary restraining order ("TRO") issued the same day the complaint was filed.

This appeal highlights the sometimes routine fashion in which TROs are issued to unsuspecting parties, who, lacking fair notice of the prohibited conduct, may unwittingly invite a contempt citation. We conclude that the TRO was improvidently issued because it failed to comport with the notice and specificity provisions of Federal Rule of Civil Procedure 65 ("Rule 65"). Consequently, we vacate and reverse the district court's contempt finding and imposition of sanctions. We affirm the district court's findings and judgment with respect to trademark infringement.

## BACKGROUND

Since 1964, Reno Air has operated the National Championship Air Races, an annual air show at the Reno/Stead Airport in Nevada. The show features airplanes that race around pylons[1] for cash prizes and stunt aircraft that perform acrobatic maneuvers. Each year, approximately 80,000 to 90,000 people attend the event, which generates millions of dollars of revenue. Reno Air extensively advertises and promotes the event through a variety of print and electronic media, referring to it both as "Reno Air Races" and "National Championship Air Races."

Since commencement of the races in 1964, Reno Air has used a logo featuring a checkered pylon with two airplanes circling it ("pylon logo") to identify the event and merchandise promoting the event. Reno Air is the registered owner of two federal trademarks,[2] numbers 1,322,146 and 1,371,797,

---

[1] A "pylon" is defined as a "post or tower marking a prescribed course of flight for an airplane." Merriam Webster's Collegiate Dictionary 952 (10th ed. 1993).

[2] A "trademark" is "any word, name, symbol, or device, or any combination thereof" used by a person to "identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

for the "pylon logo;" the marks are identical, although one is a trademark and the other a service mark. The marks have been registered with the United States Patent and Trademark Office since 1985 and have acquired incontestable status.[3] The trademark registrations are in four classes that include entertainment services, printed materials, cloth patches, caps and t-shirts. Through special licensing agreements, Reno Air permits vendors situated inside the gates of the show to sell merchandise bearing the trademarks.

McCord owns Western Sales Distributing Company, a sole proprietorship. Between 1999 and 2002, McCord sold merchandise, including t-shirts, caps and mugs, depicting the term "Reno Air Races" and artwork containing images of at least one airplane and a pylon, from booths located just outside of the gates of the air races. In 1999, McCord sold approximately $4,433 worth of such merchandise; in 2000, he sold $10,152; in 2001, $3,174; and in 2002, $9,152.

Sometime in 2000, McCord received a letter and telephone call from Reno Air's attorney, who objected to McCord's sale of merchandise at the air races. The following year, a representative from Reno Air advised McCord that his sale of such merchandise violated Reno Air's rights. The district court noted that Reno Air was unable to produce a copy of the letter sent to McCord in 2000 and that the testimony was also vague on exactly how clearly Reno Air expressed its objections to McCord's sale of the merchandise prior to this litigation.

On September 13, 2002, Reno Air filed a complaint in the District of Nevada, alleging McCord's infringement of the federally registered "pylon logo" mark in violation of 15 U.S.C. § 1114(1)(a) and infringement of the unregistered "Reno Air Races" mark in violation of 15 U.S.C. § 1125(a).

---

[3]A federally registered trademark may become statutorily "incontestable" if it has been in "continuous use for five consecutive years subsequent to the date of such registration." 15 U.S.C. § 1065.

That same day, Reno Air also filed an ex parte application for a TRO pursuant to Rule 65(b) and a motion for a preliminary injunction. Reno Air's TRO application stated that notice to McCord was unnecessary because "of the immediate and irreparable harm that will occur if the restraining order is not immediately issued . . . and because of the significant risk that [McCord] may leave the Reno/Stead Airport area and destroy or conceal [his] infringing merchandise once [he] receive[s] notice of the lawsuit."

The district court granted the application after a telephonic hearing, and issued an ex parte TRO that prohibited McCord from engaging in the following activities:

> (1) making, manufacturing, using, distributing, shipping, licensing, selling, developing, displaying, delivering, advertising and/or otherwise marketing or disposing of any goods, packaging or any other items which bear the trademarks set forth in Exhibit F to Mr. Houghton's declaration, or any confusingly similar variations thereof;
>
> (2) disposing of, destroying, moving, relocating or transferring any and all goods and other items . . . bearing the trademarks set forth in Exhibit F to Mr. Houghton's declaration, or any confusingly similar variations thereof;
>
> (3) disposing of, destroying, moving, relocating or transferring any means for making products having the trademarks set forth in Exhibit F to Mr. Houghton's declaration, or any confusingly similar variations thereof . . . ;
>
> (4) disposing of, destroying, moving, relocating or transferring any documents pertaining to the creation, development . . . of items bearing the trademarks set forth in Exhibit F to Mr. Houghton's

declaration, or any marks confusingly similar thereto.

"Exhibit F," to which the TRO referred extensively, contained a picture of a t-shirt design sold by McCord that depicted a stylized image of two airplanes and a checkered pylon, with the words "Reno Air Races" underneath.

Reno Air served McCord with the TRO late in the afternoon on September 13, 2002, the Friday of the air races weekend. McCord was outside the gates of the show when he was served and was packing up for the day. He did not read the TRO until later that evening and over the weekend had difficulty locating an attorney with whom he could consult about the meaning of the injunction. Even after the weekend, finding an attorney in the Reno area who did had not have a conflict of interest as a result of a prior relationship with Reno Air was not easy. McCord finally located an attorney in Carson City, Nevada.

As of Saturday, September 14, 2002, McCord stopped selling t-shirts containing the exact design pictured in Exhibit F. McCord continued to sell merchandise containing the term "Reno Air Races" and depicting a pylon and airplanes until the end of the air show on Sunday, September 15, 2002.

In April 2003, more than six months after the show closed, Reno Air filed a motion for contempt and claimed that McCord violated the TRO. The district court denied this application without prejudice to its renewal at trial. A two-day bench trial was held in February 2004. The district court entered a final judgment in April 2004.

The district court found that McCord infringed "Reno Air Races" and the "pylon logo," which were protectable marks under the Lanham Act. The district court awarded Reno Air $6,727 in damages arising from the sale of infringing merchandise and permanently enjoined McCord from "making,

manufacturing, [or] distributing . . . any goods, packaging or any other items which bear the Marks, or any confusingly similar variations thereof."[4] The district court also found McCord in civil contempt for continuing to sell infringing merchandise after being served with the TRO on September 13, 2002. The district court imposed contempt sanctions in an amount equal to Reno Air's reasonable attorneys' fees and costs in connection with the TRO and contempt motion.

## ANALYSIS

## I. CONTEMPT

"We review for abuse of discretion the district court's civil contempt order, including the decision to impose sanctions." *Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397, 1403 (9th Cir. 1997). "[W]e will not reverse unless we have a definite and firm conviction that the district court committed a clear error of judgment after weighing the relevant factors." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

"Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Id.*[5]

---

[4]The district court declined to award attorneys' fees under 15 U.S.C. § 1117(a), which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The district court reasoned that the evidence did not justify a finding that this was an "exceptional case" under § 1117(a)—i.e., a case in which the infringement was "willful, deliberate, knowing or malicious." *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1217 (9th Cir. 2003).

[5]McCord's contention that the district court wrongly characterized the contempt as "civil" rather than "criminal" is without merit. Where the purpose of contempt is "remedial, i.e. to compensate for the costs of the contemptuous conduct or to coerce future compliance with the court's order, the contempt order is civil." *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787, 790 (9th Cir. 1989). In awarding

The contempt " 'need not be willful,' " *id.* (quoting *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987)); however, a person should not be held in contempt if his action "appears to be based on a good faith and reasonable interpretation of the court's order." *Id.* (internal quotations and citations omitted).

## A.   EX PARTE PROCEEDING

We consider first whether the TRO was properly granted ex parte without notice. Rule 65(b) provides, in relevant part:

> A [TRO] may be granted without written or oral notice to the adverse party . . . *only if* (1) it clearly appears . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. Every [TRO] granted without notice shall . . . define the injury and state why it is irreparable and why the order was granted without notice.

Fed. R. Civ. P. 65(b) (emphasis added). In *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423 (1974), the Supreme Court explained that circumstances justifying the issuance of an ex parte order are extremely limited:

---

Reno Air reasonable attorneys' fees and costs associated with the TRO and the contempt motion, the district court noted that such sanctions were "appropriate to compensate the plaintiff for any losses sustained . . . ." Thus, the purpose was remedial, and the district court properly denominated the contempt as "civil." *Id.* (explaining that where the sanction for contempt was liability for costs associated with the contempt motion, including reasonable attorneys' fees, the sanction was "remedial," and contempt was properly characterized as civil).

> The stringent restrictions imposed . . . by Rule 65 on the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.

*Id.* at 438-39 (internal citation omitted).

**[1]** Consistent with this overriding concern, courts have recognized very few circumstances justifying the issuance of an ex parte TRO. For example, an ex parte TRO may be appropriate "where notice to the adverse party is impossible either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984). Obviously, this exception is inapplicable as Reno Air knew exactly where McCord was—outside of the air show gates—and thus, never suggested that McCord could not be found or that notice would have been, in any way, "impossible."

**[2]** In cases where notice could have been given to the adverse party, courts have recognized "a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action." *Am. Can Co.*, 742 F.2d at 322. In the trademark arena, such cases include situations where an alleged infringer is likely to dispose of the infringing goods before the hearing. *See In the Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) ("*Vuitton*"). To justify an ex parte proceeding on this latter ground, "the applicant must do more than assert that the

adverse party would dispose of evidence if given notice." *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993). "[P]laintiffs must show that defendants would have disregarded a direct court order and disposed of the goods within the time it would take for a hearing . . . [and] must support such assertions by showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history." *Id.* at 650-51; *see also Vuitton*, 606 F.2d at 4-5.

For example, in *Vuitton*, the company explained the need for an ex parte order by pointing to its experience in eighty-four previous actions against counterfeiters, where Vuitton's litigation efforts were foiled because a counterfeiter, after receiving notice of an impending injunction, and before the court could hold a hearing, transferred its inventories to other members of "closely-knit distribution networks." 606 F.2d at 2. The Second Circuit held Vuitton's showing to be sufficient to justify issuance of an order "narrow in scope and brief in its duration." *Id.* at 5. Notably, all Vuitton's TRO sought to do was "for a few hours . . . to maintain the status quo, namely the defendants' inventory of counterfeit Vuitton merchandise." *Id.* at 3.

**[3]** Reno Air's TRO application and supporting evidence can be described as thin and barebones at best. The application stated that the TRO "must issue without notice . . . because of the significant risk that Defendant may leave the Reno/Stead Airport area and destroy or conceal [his] infringing merchandise once [he] receive[s] notice of the lawsuit." The only "evidence" offered to support this assertion was a declaration from Reno Air's counsel that "[i]n [his] experience, this is a common occurrence when dealing with infringers at one time famous events such as the 'Reno Air Races' and it is well-recognized in the case law." This conclusory statement from counsel hardly qualified as evidence and certainly did not link the TRO application to McCord. McCord was no stranger to Reno Air. Curiously, Reno Air did not

advise the court of its prior dealings with McCord regarding purported trademark infringement. Nor did the company acknowledge that it had done nothing to enforce its rights following the earlier contacts. Finally, Reno Air offered no support that there was a "significant risk" that McCord, who had been working in the Reno area for many years, "may leave the Reno/Stead Airport area." Were a single conclusory statement by counsel about infringers sufficient to meet the dictates of Rule 65, then ex parte orders without notice would be the norm and this practice would essentially gut Rule 65's notice requirements.

### B.  SPECIFICITY REQUIREMENT

[4] The TRO was also deficient for lack of specificity. Rule 65(d) requires that any injunction or restraining order be "specific in terms" and describe "in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ. P. 65(d). "If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt." *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996). As the Supreme Court explained in *Int'l Longshoremen's Ass'n. v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64 (1967):

> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Id.* at 76; *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a con-

tempt citation on a decree too vague to be understood."). Thus, we look to the language of the TRO to determine if it provided McCord with fair and well-defined notice of the prohibited conduct. Here, the TRO fell short.

[5] The TRO enjoined McCord from making, distributing or disposing of "items which bear the trademarks set forth in Exhibit F to Mr. Houghton's declaration, or any confusingly similar variations thereof." McCord suggests that the TRO's reference to an outside document—Exhibit F—automatically violated Rule 65(d). Although a number of our sister circuits read the "no reference" requirement strictly,[6] we have permitted incorporation by reference in certain limited scenarios, for example, where the referenced document is "physically attached to the [order] itself." *State of California v. Campbell*, 138 F.3d 772, 783 (9th Cir. 1998); *Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1343 (9th Cir. 1982) (holding that the district court did not err in attaching a confidential appendix to its order that set out the prohibited acts); *see also Davis v. San Francisco*, 890 F.2d 1438, 1450 (9th Cir. 1989) (permitting reference to fire department rules "already binding upon the officers" and where "[i]t is unlikely the officers could argue they were unaware of these rules").

[6] Here, the district court noted that Exhibit F was "made a part of the [TRO] and provided to McCord at the time that the order was served on him." Thus, while ordinarily the TRO should not incorporate by reference another document, *see Henry Hope*, 674 F.2d at 1343, the reference to the attached Exhibit F does not, in and of itself, invalidate the contempt finding. We emphasize, however, that incorporation by refer-

---

[6] *See e.g.*, *H.K. Porter Co. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24, 27 (7th Cir. 1977) (holding that incorporation by reference was a "serious and decisive" error that precluded a finding of contempt); *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 371 (10th Cir. 1996) (strictly construing the "no-reference" requirement of Rule 65(d)); *Seattle-First Nat'l. Bank v. Manges*, 900 F.2d 795, 799-800 (5th Cir. 1990) (same); *Thomas v. Brock*, 810 F.2d 448, 450 (4th Cir. 1987) (same).

ence should be the rare exception rather than the rule, and district courts should be particularly cautious where the injunctive order is issued at the outset of litigation, before the receiving party has acquired a context for understanding the referenced document and the subject matter of the dispute. The language of Rule 65 is exacting and we underscore that the narrow exceptions do not merit expansion, and certainly not in this case.

[7] More problematic in this case is the fact that neither the TRO nor Exhibit F clearly identified and described the "trademarks" at issue. The operative language of the TRO did not reference the trademark registrations and curiously did not describe the marks themselves.[7] The referenced attachment, Exhibit F, simply contained a copy of a t-shirt design sold by McCord. The t-shirt included the terms "Reno Air Races," "Reno, Nevada," "USA," "2002," and a picture of two airplanes positioned to the left of a checkered pylon. Nothing in Exhibit F identified what trademarks were contained in Exhibit F. Looking at this t-shirt design, one is hard pressed to know what trademarks are referenced in the order, whether the "trademarks" invoked in the TRO referred to the t-shirt, the design as a whole, the phrase "Reno Air Races," all of the words depicted, the checkered pylon, one or more airplanes, the pylon plus one or more airplanes, or some other combination.

[8] In addition to the unexplained "trademarks," McCord points to the ambiguity of the phrase "confusingly similar variations thereof." If a reader of the TRO were left in the dark about what trademarks were covered, then surely bootstrapping the order to include "confusingly similar varia-

---

[7]Although the paragraph relating to the show cause order referred generally to "the 'pylon logo' or 'Reno Air Races' trademarks," it did not reference the registrations, photographs or clarifying information that described the actual trademarks at issue. The operative paragraphs of the TRO did not even reach this level of identification.

tions thereof" would leave the reader's head spinning with more confusion. "Variations of what?" one might ask. Because the underlying order failed to identify the trademarks with sufficient specificity, the order was hardly enforceable as to the "variations thereof" language.

Ultimately, there are no magic words that automatically run afoul of Rule 65(d), and the inquiry is context-specific. "[T]he fair notice requirement of Rule 65(d) must be applied 'in the light of the circumstances surrounding [the order's] entry.' " *Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (quoting *United States v. Christie Indus., Inc.*, 465 F.2d 1000, 1007 (3d Cir. 1972)). This case not only points out the pitfall of incorporating documents by reference in a TRO but also the hazard of failing to identify with particularity the enjoined conduct in conjunction with specific identification and description of the trademarks. The recipient of a TRO, which usually takes effect immediately, should not be left guessing as to what conduct is enjoined. The benchmark for clarity and fair notice is not lawyers and judges, who are schooled in the nuances of trademark law. The "specific terms" and "reasonable detail" mandated by Rule 65(d) should be understood by the lay person, who is the target of the injunction. This is a circumstance, among many in the legal field, that cries out for "plain English."

**[9]** Here, the TRO was issued the same day the action commenced, and the parties had no prior litigation history. Although they had engaged in limited communications, Reno Air could not even find the letter it purportedly sent to McCord. Given this backdrop and the failure of the TRO (and Exhibit F) to clearly identify the trademarks at issue, the TRO's prohibition—i.e. enjoining infringement of "the trademarks set forth in Exhibit F . . . or any confusingly similar variations thereof"—would certainly have left a lay person scratching his head in confusion. The TRO failed to meet even the most minimal fair notice requirement.

**[10]** As the TRO was improperly issued ex parte and failed to describe the prohibited conduct with specificity, the order cannot serve as the foundation for a finding of civil contempt.[8] We vacate and reverse the part of the district court's order finding McCord in contempt for violating the TRO and imposing contempt sanctions.

## II.   TRADEMARK INFRINGEMENT

**[11]** A claim of trademark infringement under § 1114(1)(a) of the Lanham Act requires a trademark holder to demonstrate: (1) ownership of a valid mark (i.e., a protectable interest), and (2) that the alleged infringer's use of the mark " 'is likely to cause confusion, or to cause mistake, or to deceive' " consumers. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)), *on remand from* 543 U.S. 111 (2004).

Although the district court determined that McCord infringed both the "pylon logo" and the "Reno Air Races" marks, McCord only challenges the district court's findings with respect to the "pylon logo." It is undisputed that the "pylon logo" is a registered mark that has become incontestable. "The incontestability provisions of the Lanham Act were designed to provide a means for a trademark holder to 'quiet title in the ownership of his mark.' " *Id.* at 603 (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985)). An incontestable registration is "conclusive evidence of the validity of the registered mark." 15 U.S.C. § 1115(b).

### A.   GENERICNESS AND DESCRIPTIVENESS

On appeal, McCord essentially concedes that Reno Air has an exclusive right to its "unique composite mark"—i.e. the registered "pylon logo." McCord even goes beyond this con-

---

[8]We do not need to reach McCord's remaining arguments challenging the district court's contempt finding and imposition of sanctions.

cession to suggest that Reno Air has an exclusive right to the distinctive "Eiffel-tower"-like pylon depiction in its registered mark. The pylon trademark contains not only a stylized checkered pylon, but an artistic rendition of two airplane silhouettes that encircle it and lines representing the airplanes' respective paths around the pylon. In effect, in the face of these concessions, what McCord really asks from us is a prophylactic declaration that pylons in general are generic and that he can use some form of a pylon with impunity. Although we are not unsympathetic to his effort to cabin a safe harbor regarding future use, we are not in the business of providing such advisory opinions, and to the extent that McCord's future depictions are challenged by Reno Air, it is for the district court to determine in the first instance whether trademark infringement has occurred.

**[12]** To be sure, even an incontestible mark is subject to challenge as generic. "Generic marks are not capable of receiving protection because they identify the product, rather than the product's source," *KP Permanent*, 408 F.3d at 602, and "a registered mark may be canceled at any time on the grounds that it has become generic." *Park 'N Fly*, 469 U.S. at 194. However, registered marks are endowed with a strong presumption of validity, and a defendant has the burden of showing genericness by a preponderance of the evidence. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).

**[13]** Even construing McCord's pleadings liberally as asserting the argument that the genericness inquiry should focus on the checkered pylon as the "most salient feature" of the pylon logo, *KP Permanent*, 408 F.3d at 604, no single feature of the incontestable logo mark—e.g., the checkered pylon or the two airplane silhouettes circling around it with lines representing their trails—merits such an exclusive focus. Thus, the district court correctly focused its validity inquiry on the trademark as a whole and appropriately concluded that McCord failed to meet his burden of showing that the regis-

tered pylon logo had become generic. *See California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985) ("[T]he validity of a trademark is to be determined by viewing the trademark as a whole. . . . [T]he composite may become a distinguishing mark even though its components individually cannot").

McCord's position that the "pylon logo" is an invalid descriptive mark that has not acquired secondary meaning is foreclosed by hornbook trademark law. "[A] defendant in a trademark infringement action cannot assert that an incontestable mark is invalid because it is descriptive and lacks secondary meaning." *KP Permanent*, 408 F.3d at 606; *see Park 'N Fly*, 469 U.S. at 196 (holding that unlike genericness, "[m]ere descriptiveness is not recognized . . . as a basis for challenging an incontestable mark").

## B. LIKELIHOOD OF CONFUSION

**[14]** The core element of trademark infringement is whether customers are likely to be confused about the source or sponsorship of the products. *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002). We review the district court's determination of likelihood of confusion for clear error. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse even though . . . as the trier of fact, we would have weighed the evidence differently." *Interstellar*, 304 F.3d at 941.

An eight-factor test—the so-called *Sleekcraft* factors—guides the assessment of whether a "likelihood of confusion" exists. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).[9] The district court applied the eight-factor

---

[9]"Those factors are: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual

*Sleekcraft* test to the "pylon logo" and "Reno Air Races" marks and made explicit findings based on the evidence at trial, including the following: (1) Reno Air's trademarks were "strong" and it had "expended substantial sums of money and effort in advertising and promoting;" (2) McCord sold substantially similar merchandise in "extremely close proximity to the Reno Air Races"—i.e., McCord's booths were "directly outside the gate;" (3) McCord's merchandise contained substantially similar marks with an "airplane pylon motif and the use of words 'Reno Air Races' prominently displayed;" (4) "a number of customers asked whether the defendant was selling official merchandise, indicating that there was confusion as to whether or not the defendant was affiliated with the Reno Air Races event as an authorized sponsor;" (5) "customers [did] not exercise a great deal of care in selecting t-shirts and other merchandise which is relatively inexpensive;" (6) McCord intended to "trade off plaintiff's goodwill;" and (7) there was a "strong possibility" that McCord would expand his business because he testified that "he hoped to expand his services and operations." Based on these findings, the district court concluded that McCord's use of the marks was likely to confuse the public as to the source of the goods.

McCord does not challenge the district court's finding of infringement with respect to the "Reno Air Races" mark. As to the "pylon logo," he challenges the district court's findings with respect to a single factor—the "similarity of the marks." He argues that the district court erred because the airplane/pylon motif used in his merchandise does not resemble Reno Air's "pylon logo." In his brief, McCord summarizes this argument as follows: "Now Appellate court, please compare these two. They don't look anything alike, do they?"

---

confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other markets." *KP Permanent*, 408 F.3d at 608. "[N]ot all of the factors are of equal importance or applicable in every case." *Id.*

We note at the outset that "the legal question is not whether the marks look similar to us but whether they look similar to ordinary consumers" of the products, and it is the district court that "heard testimony on that subject and received evidence of actual confusion." *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428-29 (7th Cir. 1985). "Our job as an appellate court is not to reweigh the evidence." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985) (en banc). Thus, we reject McCord's argument that we should apply de novo review to the district court's findings because we are in as a good a position as the trial court to compare McCord's designs to Reno Air's trademark. *See id.* at 1355 (explaining that de novo review of likelihood of confusion "would demand a significant diversion of appellate court resources to a task which more properly belongs to the district court judge").

The district court's findings are detailed and reference evidence not only of actual consumer confusion but of the practical, real world effect of McCord selling unofficial Reno Air Races merchandise directly outside the gates of the air show. In addition, to the extent that McCord's merchandise included a depiction of the airplane/pylon motif, that design did not appear alone but was accompanied by the "Reno Air Races" mark or some combination of the terms "Reno" and "Air Races."

When viewed in isolation, it is true that there is no identical resemblance between the airplane/pylon motif in McCord's designs and Reno Air's registered "pylon logo." For example, the airplanes in McCord's design contain greater detail than the plane silhouettes in the "pylon logo," and unlike the "pylon logo," the pylon in McCord's design has a flag above it and is not centered between the planes. However, similarity of the marks is but one factor in the *Sleekcraft* test, albeit an important one, and a court does not consider the similarity of the marks in the abstract, but rather "in light of the way the marks are encountered in the marketplace and the circum-

stances surrounding the purchase." *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984).

**[15]** The confusing similarity arose from the fact that McCord sold merchandise featuring the airplane/pylon motif alongside the terms "Reno Air Races," outside the gates of the air show, in close proximity to the sale of official merchandise. Considering the airplane/pylon depictions in the context in which they appeared to ordinary consumers in the marketplace, and "[w]eighing the marks' similarities more heavily than their differences," *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1219 (9th Cir. 1987), the district court did not clearly err in finding substantial similarity. McCord does not dispute the district court's remaining factual findings with respect to likelihood of confusion, including evidence of actual consumer confusion, which we have emphasized "is strong evidence that future confusion is likely. . . ." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993). Finally, it bears noting that McCord's acknowledgment that he has no right to use the "Reno Air Races" mark should, standing alone, take the air out of his argument that his composite designs pass muster. The district court employed a comprehensive likelihood of confusion analysis and its findings were not clearly erroneous.

## C.  PERMANENT INJUNCTION

In addition to an award of damages, the district court permanently enjoined McCord from selling items "which bear the Marks [i.e., the 'pylon logo' and 'Reno Air Races' trademarks], or any confusingly similar variations thereof."[10] 15 U.S.C. § 1116(a) vests the district court with the "power to

---

[10]In its entirely, the permanent injunction language reads:

> [Reno Air] shall be entitled to a permanent injunction against defendant McCord, enjoining him, his officers, directors, servants, employees, attorneys, agents, representatives, and all persons in active concert or participation with him, from making, manufacturing, using, distributing, shipping, licensing, selling, developing, displaying, delivering, advertising, and/or otherwise marketing or disposing of any goods, packaging, or any other items which bear the Marks, or any confusingly similar variations thereof.

grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" of the trademark owner. The Supreme Court recently reiterated that district courts should apply "traditional equitable principles" in deciding whether to grant permanent injunctive relief, *eBay Inc. v. MercExchange, L.L.C.*, ___ U.S. ___ , 126 S. Ct. 1837, 1840 (2006),[11] and the decision is "an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.* at 1839.

[16] McCord does not point to any error in the district court's assessment or application of traditional equitable principles. Instead, McCord challenges the permanent injunction on the ground that he cannot be enjoined from being able to depict "any and all visualizations of a checkered pylon." McCord overreads the injunction language. Significantly, the injunction only enjoined him from infringing on Reno Air's "Marks"—defined by the district court as "the 'pylon logo' and 'Reno Air Races' trademarks and service marks"—and "any confusingly similar variations thereof."[12] McCord emphasizes that his argument is pylon-specific and that he has never suggested that the district court erred when it enjoined him from depicting a checkered pylon circled by two airplanes.

---

[11]According to these equitable principles, a plaintiff seeking a permanent injunction must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 1839.

[12]McCord does not raise a specificity challenge to the permanent injunction. Unlike the TRO, the district court's Final Judgment, which contains the permanent injunction language, specified the marks at issue.

Like the genericness challenge, McCord's objection to the permanent injunction is really an attempt to solicit our assurance that he can depict "any and all checkered pylons" in the future. In support of that claim he points to record evidence that the notion of a pylon is generic and universal. As with his trademark challenge, we decline to provide such prophylactic assurances or to address trademark infringement in the abstract. The district court determined that McCord infringed the specific "pylon logo" and "Reno Air Races" marks, his continued use posed a strong likelihood of confusion, and Reno Air's remedy at law was inadequate to compensate for the injury. We conclude that the district court did not abuse its discretion in granting permanent injunctive relief with respect to those marks.

## III.  LACHES

McCord agues that the district court should have applied the equitable defense of laches to bar Reno Air's claims of trademark infringement with respect to the "Reno Air Races" mark and the "pylon logo." "Laches is an equitable time limitation on a party's right to bring suit . . . [and] is a valid defense to Lanham Act claims." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (internal quotations and citations omitted). Although the district court did not make express findings with respect to McCord's laches defense, it specifically denied "each" of McCord's defenses. Thus, we may assume that the district court rejected the laches defense.[13] *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 515 (9th Cir. 1989). We review this decision for an abuse of discretion. *In re Beaty*, 306 F.3d 914, 921 (9th Cir. 2002) (clarifying that the appropriate standard of review for laches determinations is abuse of discretion).

---

[13]Reno Air incorrectly asserts that the "first time McCord raised laches was in his Post-Trial Brief on Willful Infringement." Because McCord explicitly raised the issue in several pre-trial submissions, including his "First Amended Answer" and in his pre-trial "Proposed Findings of Fact and Conclusions of Law," we address the merits of this issue.

Laches bars trademark infringement claims "only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1061 (9th Cir. 1999). "While laches and the statute of limitations are distinct defenses . . . [i]f the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable." *Jarrow*, 304 F.3d at 835. If the plaintiff filed suit outside this analogous period, "courts have often presumed that laches is applicable." *Id.* at 836. Because the Lanham Act contains no explicit statute of limitation, courts "borrow" the analogous state time period, *id.*, which the parties here agree is three years under Nevada's fraud or "catchall" statutes of limitation. Nev. Rev. Stat. § 11.190(3).

"In determining the presumption for laches, the limitations period runs from the time the plaintiff knew or should have known about his . . . cause of action." *Jarrow*, 304 F.3d at 838. "This principle is grounded in the fact that laches penalizes inexcusable dilatory behavior; if the plaintiff legitimately was unaware of the defendant's conduct, laches is no bar to suit." *Id.* In addition "[a] party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit." *Id.* at 835.

There is no evidence that Reno Air knew of McCord's infringement before 2000. In 2000, Reno Air attempted to contact McCord to object to his sale of merchandise outside of the air show. Although McCord argues that Reno Air should have known of his infringing activities from 1990 to 1999 because he sold similar merchandise to certain retail outlets in the Reno area, the record demonstrates a mere handful of limited sales (i.e., less than a hundred t-shirts) during this period and no evidence of knowledge by Reno Air. Perhaps the earliest that Reno Air should have known about McCord's infringing conduct was in 1999, the year that

McCord began selling merchandise outside the gates of the air show.

**[17]** Reno Air brought suit in 2002, within three years of when it knew or reasonably should have known of McCord's infringing conduct; thus, the "strong presumption is that laches is inapplicable." *Id*. McCord has not demonstrated prejudice sufficient to overcome this strong presumption. *See Shouse v. Pierce County*, 559 F.2d 1142, 1147 (9th Cir. 1977) ("It is extremely rare for laches to be effectively invoked when a plaintiff has filed his action before limitations in an analogous action at law has run."). The district court did not abuse its discretion in declining to apply laches.

## IV. EXCLUSION OF TESTIMONY

Upon Reno Air's motion, the district court excluded the testimony of Thorton Audrang because he was not identified in the pretrial order or listed in Fed. R. Civ. P. 26 disclosures. McCord contends that this evidentiary ruling was reversible error. Audrang was a former manager at Reno Air who was to testify that "he never felt [that] Reno Air had a trademark right in the term 'Reno Air Races' " prior to this case. Not only is this point moot because McCord does not challenge the district court's findings as to the "Reno Air Races" mark, even if the testimony were admissible, the district court was well within its discretion to exclude the witness.

"A court may exclude testimony from witnesses not listed in the pre-trial witness list." *Price v. Seydel*, 961 F.2d 1470, 1474 (9th Cir. 1992). When deciding to exclude testimony, a court should consider the following factors:

(1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified;

(2) the ability of that party to cure the prejudice;

(3)   the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case . . . ;

(4)   bad faith or willfulness in failing to comply with the court's order.

*Id.* (quoting *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245 (7th Cir. 1982), *aff'd on other grounds*, 465 U.S. 752 (1984)). The district court gave due consideration to these factors and determined that McCord's repeated failure to disclose the witness was willful and Reno Air would be prejudiced if the testimony was permitted:

> I'm very troubled because clearly, [McCord's] counsel kn[ew] about [this witness] for some time, didn't move to amend the pretrial order, didn't list him in the pre-trial order . . . so that [Reno Air's] counsel then would have any opportunity to respond to it, and would have had an opportunity to take a deposition before the trial.

**[18]** Trial by surprise is no longer countenanced. The district court's exclusion order was not an abuse of discretion. *See Spray-Rite*, 684 F.2d at 1245 (holding that the district court did not abuse its discretion where it "gave due consideration to these factors" and concluded that permitting the excluded witness's testimony would cause prejudice to the other party who "did not have adequate time to prepare for the witness").

## CONCLUSION

The TRO cannot support a finding of civil contempt because it was improperly issued ex parte and failed to describe the prohibited conduct with specificity. We vacate and reverse paragraphs 5 and 6 of the district court's Final Judgment finding McCord in contempt for violating the TRO

and imposing contempt sanctions. We affirm the judgment in all other respects.

**VACATED** and **REVERSED** in part; **AFFIRMED** in part. Each party shall bear its own costs on appeal.