**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TILLAMOOK COUNTRY SMOKER, INC.,
an Oregon corporation,
　　　　　　*Plaintiff-Appellee,*

v.

TILLAMOOK COUNTY CREAMERY
ASSOCIATION, an Oregon
cooperative corporation,
　　　　　　*Defendant-Appellant.*

No. 04-35843

D.C. No.
CV-02-01540
MWM

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
September 12, 2006—Portland, Oregon

Filed October 11, 2006

Before: Michael Daly Hawkins, Barry G. Silverman, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Silverman

**COUNSEL**

John Peter Staples, Chernoff, Vilhauer, McClung & Stenzel, Portland, Oregon, for the defendant-appellant.

James N. Westwood, Stoel Rives, Portland, Oregon, for the the plaintiff-appellee.

**OPINION**

SILVERMAN, Circuit Judge:

The Tillamook County Creamery Association, the maker of the Tillamook brand of cheese for nearly a hundred years, has a beef with a company called Tillamook Country Smoker, a purveyor of smoked meats and jerky. In 1976, Tillamook Country Smoker began selling its meat products under its name. The cheese people had actual knowledge of Tillamook Country Smoker's activities, but never said a word. Not only

that, the cheese folks even sold Tillamook Country Smoker's products in its own gift shop and in its mail-order catalog.

Twenty-five years later, when Tillamook Country Smoker began selling its meat snacks in supermarkets, the cheese people for the first time claimed trademark infringement and sought to enjoin the meat people from making any further use of the Tillamook Country Smoker name. The cheese people explain their quarter-century delay in taking action against Tillamook Country Smoker by contending that they are victims of "progressive encroachment." The district court ruled that the cheese people are barred by laches. We agree.

## I.   Background

The Tillamook County Creamery Association ("Creamery") is a 150-member dairy cooperative in the city of Tillamook in Tillamook County, Oregon. The association has a major presence in the area. On its official website, Tillamook County describes itself as "The Land of Cheese, Trees and Ocean Breeze." *See Tillamook County, Oregon*, *at* http://www.co.tillamook.or.us (last visited Sept. 25, 2006).

Creamery markets its products nationally through retail grocery and club stores, with annual revenues topping $250 million. Its primary product is cheese, and is second only to Kraft in the sale of certain cheeses. Besides selling in retail stores, Creamery also maintains a mail-order catalog and a factory store along Highway 101 in Tillamook.

Creamery began using the "Tillamook" mark for its cheese and butter products as early at 1918. It registered the "Tillamook" mark with the U.S. Patent and Trademark Office ("PTO") in 1921 and 1950.

In 1975, a member of the Creamery Association, Crawford Smith, approached Creamery's General Manager Beale Dixon about his desire to start a processed meat company. Smith

informed Dixon of his wish to operate the business under the mark "Tillamook Country Smoker." Dixon did not object "so long as Mr. Smith did not build a cheese factory." Tillamook Country Smoker ("Smoker"), also based in Tillamook County, was thus born. Today, it employs about 250 workers and grosses $41 million annually.

Smoker began operations in 1976, employing a number of label designs. Two prominent designs featured a "burning ham" and a ribbon. All labels, however, featured the words "Tillamook Country Smoker." On some of its labels the word "Tillamook" was the same font size as "Country Smoker." On several others, the word "Tillamook" was larger than "Country Smoker." Creamery never objected.

Smoker's original product line was marketed to deli counters. After 10 months, Smoker began distributing jerky and smoked beef chunks primarily to convenience stores and mom-and-pop groceries, although some of Smoker's products ended up in supermarkets as early as 1984. Not only did Creamery refrain from objecting to Smoker's use of the word "Tillamook," it actively encouraged the use by selling Smoker's products in its own store and mail-order catalog.

In 1985, after approximately 10 years in business, Smoker applied for registration of the mark "Tillamook Country Smoker." Smoker notified Creamery of this application, but Creamery said nothing. The PTO refused the application because the mark was "confusingly similar" with Creamery's, and the two companies were selling complementary products in similar channels of trade. Nevertheless, Smoker continued to use the mark after the PTO's rejection — all without complaint from Creamery.

In 1995, Smoker filed a new trademark application seeking to register a combined word and design mark consisting of the words "Tillamook Country Smoker" fronting its "ribbon" design. Creamery did not object, and the PTO approved this

application in 1997. The parties refer to this label as Smoker's "ribbon design" mark, the registration of which Creamery seeks to cancel in this litigation.

Creamery and Smoker's symbiotic relationship continued during this period. Creamery's catalog often described its products and Smoker's with little distinction between the companies. For example, in its 1997-1998 catalog, Creamery referred to Smoker's "Jerky in a Jar" as "*our* one pound jars of Old Style Beef Jerky" (emphasis added). Similar cheese and meat combinations were also offered in Creamery's factory store and website. During this period, Smoker employees would regularly deliver its products to Creamery. Creamery would then deliver Smoker's products to customers.

In the mid-1990s, Smoker sought to increase its direct sales to grocery stores. Believing that its brand image was unsuited for grocery chains, Smoker hired a label designer and brand consultant. In a report dated November 12, 1996, the consultant informed Smoker that it lacked brand identity with its customers due in large part to the generic look of Smoker's past labels, and Smoker's inconsistent label designs. In response, Smoker re-branded most of its products with the "circle T" design. The word "Tillamook" appeared in block lettering above the small phrase "Country Smoker." Below or to the side of "Tillamook Country Smoker" appeared a large "T" with a circle around it.

Smoker's direct sales to grocery stores and club warehouses grew significantly in the following years. In 1997, sales to such entities were less than $170,000. By 2002, Smoker's sales had increased to over $7 million.

Smoker submitted two trademark applications during this period. First, on September 21, 1999 — and despite the PTO's prior denial in 1985 — Smoker applied for registration of the "Tillamook Country Smoker" word mark. The PTO approved the application, but before the final registration was

issued, Creamery lodged its opposition. In 2002, Creamery sought to cancel Smoker's 1997 registration of its ribbon-design. Second, on April 10, 2000, Smoker applied for registration of the word mark "Tillamook Jerky." The PTO denied the application, ruling that the "Tillamook" wording was "highly similar" with Creamery's registered mark.

In 1998, Creamery began recording instances of brand confusion between its products and Smoker's. Several grocery chains wrongly displayed Smoker's products under the Creamery "Tillamook" mark or the Creamery logo. Another chain mistakenly sent invoices for Smoker products to Creamery. Consumers also contacted Creamery about Smoker products, including a group of teachers who worried about the resemblance between Smoker's "jerky chew" product and chewing tobacco. Between 1997 and 1999, Creamery noted four confusion contacts. In 2000, the number of confusion contacts rose to 40 instances, 96 in 2001, and 106 in 2002.

In September 2000, twenty-five years after Tillamook Country Smoker began business and started selling under that name, Creamery wrote a cease-and-desist letter to Smoker, objecting to Smoker's use of the word "Tillamook." In response, Smoker brought this suit in the District of Oregon seeking the following declaratory judgments: (i) Smoker is the owner of the trademark "Tillamook Country Smoker" and the mark does not infringe on Creamery's "Tillamook" mark; (ii) Smoker's registration of the ribbon-design mark is valid; and (iii) Smoker is entitled to issuance of a trademark registration for the word mark "Tillamook Country Smoker."

Creamery asserted various counterclaims for trademark infringement, dilution, and unfair competition. It sought an injunction preventing Smoker from using the name "Tillamook" or any other mark which is likely to cause confusion. Additionally, Creamery sought an order declaring that Smoker's use of the "Tillamook Country Smoker" mark, the "Tilla-

mook Jerky" mark, and the "TillamookJerky.com" domain name infringed on Creamery's trademark.

The parties filed cross-motions for summary judgment. The district court granted partial summary judgment to Smoker on the use of the "Tillamook Country Smoker" mark, finding that Creamery's objections were barred by laches. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n* ("*Tillamook I*"), 311 F. Supp. 2d 1023, 1040 (D. Or. 2004). The court granted partial summary judgment to Creamery, finding that Smoker's use of the "Tillamook Jerky" mark was infringing. *Id.* at 1044-45.

In a second opinion, the court granted Smoker's motion for summary judgment regarding the registration of the "Tillamook Country Smoker" mark, holding that Smoker's use of the marks would not cause a likelihood of confusion. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n* ("*Tillamook II*"), 333 F. Supp. 2d 975, 983-85 (D. Or. 2004).

## II.    Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331 and § 1338(a). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.   Analysis

### A.    Trademark Infringement Claim

**[1]** In its counterclaim, Creamery sought prospective equitable relief — an injunction against Smoker's continued use of the "Tillamook" mark — on a theory of trademark infringement. An infringement claim under the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1114(1), requires the trademark owner to demonstrate "that the alleged infringer's use of the mark is likely to cause confusion, or to cause

mistake, or to deceive consumers." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) (citation and internal quotation marks omitted). Smoker has raised the defense of laches, which can defeat an otherwise valid claim under the Lanham Act. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).

**[2]** The limitations period for laches starts "from the time the plaintiff knew or should have known about its potential cause of action." *Id.* at 838; *see also ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) ("[A] plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known . . . that [it] had a provable infringement claim against defendant."); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996) (holding that the trademark owner need not sue "until the likelihood of confusion looms large") (citation and internal quotation marks omitted).

**[3]** In analogizing a laches claim where an injunction is sought, courts first determine when the statute of limitations period expired for "the most closely analogous action under state law." *Jarrow Formulas*, 304 F.3d at 836. If the plaintiff filed within that period, there is a strong presumption against laches. If the plaintiff filed outside that period, the presumption is reversed. *See id.* at 838. The district court identified two possible limitations periods under Oregon law—two years or ten years. 311 F. Supp. 2d. at 1031. Neither party contests this ruling, nor is it disputed that Smoker began using the "Tillamook Country Smoker" mark in 1976 and that Creamery did not file suit until 2002.

**[4]** The district court then must balance the following six factors to determine whether the trademark owner's delay in filing suit was unreasonable and, therefore, barred: "(1) strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if

relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay." *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983). The party asserting laches must demonstrate that it has "suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit." *Jarrow Formulas,* 304 F.3d at 835. Creamery does not challenge this finding of the district court.

On appeal, Creamery advances three arguments for why laches should not bar its claims: first, the starting point of the laches period should be 1998, when Smoker began its direct sales to grocery stores, and not Smoker's origination in 1976; second, the district court improperly analyzed the second *E-Systems* factor (diligence) when it rejected Creamery's assertions of progressive encroachment; and third, Smoker's alleged bad faith disentitles it to the defense of laches.

## 1.    The beginning of the laches period

[5] Our precedents do not define the standard of review for determining the starting date of a laches period. In an analogous circumstance, the question of when the statute of limitations begins to run for an action at law is reviewed de novo. *See, e.g.*, *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 780 (9th Cir. 2002). De novo review is thus appropriate here.

[6] The undisputed record demonstrates that Creamery knew or should have known of possible customer confusion shortly after Smoker's origination in 1976. Smoker has always displayed the words "Tillamook Country Smoker" on its products. Those products were complementary to Creamery's products and sold through Creamery's catalog, factory store, and website, even after the new "circle T" label was adopted in 1997. "A plaintiff is certainly put on notice [for laches] where for many years the parties had plants in the same city and plaintiff had many business contacts with

defendant." 5 *McCarthy on Trademarks and Unfair Competition* § 31:38; *see also Borg-Warner Corp. v. York-Shipley, Inc.*, 293 F.2d 88, 94 (7th Cir. 1961).

Creamery argues that the laches clock should be delayed because Creamery's and Smoker's products did not share the same primary channel of distribution — supermarkets — until 1998. We rejected a similar argument in *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2004).

In *Grupo Gigante*, a large Mexican grocery chain named "Grupo Gigante" filed a trademark infringement action against the owner of two small San Diego grocery stores named "Gigante Market." Grupo Gigante had superior rights to the "Gigante" mark when the small stores opened in 1991, but waited until 1999 to bring suit, when the first Grupo Gigante stores opened in Southern California. Only at this point, Grupo Gigante argued, did the laches clock start to run because the "likelihood of confusion loom[ed] large." *Id.* at 1103. We disagreed:

> That argument rings hollow in the light of Grupo Gigante's argument that its mark already was well known in San Diego Country in 1991. Grupo Gigante cannot logically argue that it had established a protectable interest in the Gigante mark in the [defendant's] trading area in 1991, but was not obliged to protect that interest until 1999.

*Id.*

**[7]** Similarly, Creamery had a protectable interest in 1976 when Smoker first adopted the "Tillamook Country Smoker" mark. Even though Creamery and Smoker may not have operated in the identical commercial channels at the time, the two companies were using similar marks on complementary products in the same geographical area, creating the prospect of confusion. Creamery had actual notice of Smoker's allegedly

infringing mark soon after Smoker's inception, thereby starting the laches period. Because the analogous state limitations period had long expired prior to Creamery's filing in 2002, there is a presumption favoring Smoker's laches defense. Diligence on Creamery's part would have required it to speak up in 1976 or shortly thereafter.

### 2.    The second *E-Systems* factor: diligence in enforcement

When reviewing a district court's grant of summary judgment on the basis of laches, certain aspects of the district court's decision are reviewed de novo, such as whether the district court decided material factual disputes that need to be resolved at trial. *See Jarrow Formulas*, 304 F.3d at 833-34. On the other hand, the district court's application of the different *E-Systems* factors is entitled to deference. *Id.* at 834.

[8] Creamery raises the doctrine of progressive encroachment in an effort to explain and excuse its long delay in bringing suit. Under this doctrine, the trademark owner need not sue in the face of *de minimis* infringement by the junior user. The owner may wait until "the junior user of a mark moves into direct competition . . . selling the same 'product' through the same channels and causing actual market confusion." *Prudential Ins. Co. of America. v. Gibraltar Fin. Corp. of California*, 694 F.2d 1150, 1154 (9th Cir. 1982); *see also ProFitness Physical Therapy Center*, 314 F.3d at 70 (asking whether "the [junior user], after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks"). Common methods of encroachment are the junior user's expansion of its business into different regions or into different markets. *See Grupo Gigante*, 391 F.3d at 1103 (citing *Prudential Ins. Co.*, 694 F.2d at 1154).

[9] We hold that the district court did not abuse its discretion when it found no progressive encroachment from Smok-

er's redesign of its labels, or Smoker's direct sales to grocery stores. As to the labeling, the district court reasonably concluded that Smoker's 1997 redesign "[did] not in any way make the new packaging more similar to Creamery's packaging." *Tillamook I*, 311 F. Supp. 2d at 1035. The pre-1997 labels all had used the phrase "Tillamook Country Smoker," and some had emphasized the word "Tillamook." *Id.* The 1997 redesign, adopting a uniform font and adding a "circle T" logo, was an insignificant change. *Id.* Likewise, the district court did not abuse its discretion in finding that Smoker's new font and color scheme did not cause a material increase in consumer confusion.

**[10]** Similarly, the district court did not abuse its discretion in finding that Smoker's commencement of sales to supermarkets in 1997 represented normal business growth, not progressive encroachment. To establish progressive encroachment, Creamery would have had to show that Smoker "expand[ed] its business into *different* regions or into *different* markets." *Grupo Gigante*, 391 F.3d at 1103 (emphasis added). A junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment. *See Prudential Ins.*, 694 F.2d at 1154 ("[G]rowth alone does not infringement make."). Had Smoker "expanded its business" into selling cheese in grocery stores, it would be a different story.

### 3. The fourth *E-Systems* factor: good faith ignorance by the junior user

Creamery also argues that Smoker may not claim a laches defense because it did not act in "good faith ignorance" of Creamery's trademark right. The district court did not abuse its discretion in rejecting this argument.

**[11]** The district court relied on two pieces of evidence in the record to reject Creamery's assertions. First, the court recounted the 1975 meeting between Creamery General Man-

ager Beale Dixon and Smoker founder Crawford Smith, where Dixon stated that he would object to "Tillamook Country Smoker" only if Smoker was "going to build a cheese plant." *Tillamook I*, 311 F. Supp. 2d at 1026, 1032. Second, the court noted that Creamery had sold Smoker's products in its factory store and catalog for years without objecting to the use of the mark. *Id.* at 1032. These facts refute any claim of bad faith on the part of Smoker.

## B.  Injunction Based on "Inevitable Confusion"

Creamery argues that even if its claim is subject to laches, an injunction still should have issued to protect the public from "inevitable confusion" between the two product lines. *See* 15 U.S.C. § 1116(a) (granting district courts the "power to grant injunctions, according to principles of equity . . . , to prevent the violation of any right" of the trademark owner). The district court was not persuaded by this argument and neither are we.

**[12]** As we recognized in *Jarrow Formulas*, the danger of "inevitable confusion" between products will defeat a successful laches defense only in a narrow set of circumstances:

> [I]n order to ensure that laches remains a viable defense to Lanham Act claims, the public's interest will trump laches only when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being.

304 F.3d at 841. Creamery has not alleged that Smoker's meat snacks are harmful or otherwise threaten the public's safety or well being. It thus cannot show an overriding public interest that trumps Smoker's laches defense.

Even if we were inclined to narrow the *Jarrow Formulas* rule, this would not be the case for it. As the district court noted, "Creamery[ ] affirmatively [held] out Smoker's prod-

ucts" in its catalog, store, and website, prompting some of the confusion of which it now complains of. *Tillamook I*, 311 F. Supp. 2d at 1040. As the issuance of an injunction involves a balancing of equities, we generally leave the decision to the considered judgment of the district court. *See Reno Air Racing*, 452 F.3d at 1137-38. Nothing in the record leads us to second guess the court's conclusion that the equities favor Smoker in this case.

## C.  Trademark Registration Claim

In its counterclaim, Creamery sought an order from the district court directing the PTO (1) to cancel Smoker's ribbon-design mark already registered in 1997, and (2) to refuse registration of Smoker's word-only mark for "Tillamook Country Smoker," for which Smoker applied in 1999. Section 37 of the Lanham Act, 15 U.S.C. § 1119, permits district courts to resolve these subsidiary registration disputes when joined with an infringement claim.

**[13]** Under § 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), the test for trademark registration uses the same "likelihood of confusion" standard as the test for trademark infringement. *See Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1364 (Fed. Cir. 2000); 6 *McCarthy on Trademarks and Unfair Competition* § 23:78. In granting summary judgment for Smoker, the district court ruled that Creamery had conclusively admitted during discovery that Smoker's ribbon-design mark and its longstanding use of "Tillamook Country Smoker" did not create a "likelihood of confusion" with Creamery's trademarks. *Tillamook II*, 333 F. Supp. 2d at 985. Creamery argues that the district court misconstrued its response to a request for admission. We agree with the district court.

### 1.  Rule 36 admissions

**[14]** Rule 36 of the Federal Rules of Civil Procedure permits a party to "serve upon any other party a written request for the admission . . . of the truth of any matters within the scope of Rule 26(b)(1) set forth in the request that relate to statements or opinions of fact or the application of law to fact." Fed. R. Civ. P. 36(a). The effect of the admission is such that "[a]ny matter admitted under this rule is conclusively established" unless the court grants a motion to waive or amend. Fed. R. Civ. P. 36(b).[1] As the district court noted, the court and parties are bound by such admissions, which cannot be "ignored by the district court simply because it finds the evidence presented by the party against whom the admission operates more credible." *Tillamook II*, 333 F. Supp. 2d at 984 (citation omitted).

"Where the district court's ruling rests solely on law and the facts are established or undisputed, review is de novo." *Ford Motor Co. v. Todecheene*, 394 F.3d 1170, 1173-74 (9th Cir. 2005) (citation omitted).

### 2.  The meaning of Request No. 79

The request for admission at issue reads:

*Request No. 79:* [Creamery] alleges that [Smoker's] activities between 1995 and 2000 violated [Creamery's] rights in TILLAMOOK.

*Response:* Objection, the term "[Smoker's] activity" is vague and ambiguous. Moreover, Defendant is not aware of the full nature and extent of

---

[1]Creamery has not moved to amend or withdraw the admission at issue. *See Tillamook II*, 333 F. Supp. 2d at 985.

> [Smoker's] activities between 1995
> and 2000. Without waiving the
> foregoing objection and subject to
> the limitations of those objections:
> *Defendant admits that [Smoker's]*
> *activities began violating [Cream-*
> *ery's] rights in the word TILLA-*
> *MOOK at some point in the latter*
> *part of the stated time period.*

(emphasis added).

The district court construed Creamery's response as a con-
clusive admission that Smoker's ribbon-design mark and "Til-
lamook Country Smoker" word mark did not violate any of its
trademark rights until 1997, which proves that there was no
likelihood of confusion before that. *Tillamook II*, 333 F. Supp.
2d at 985. The district court held that this admission was fatal
to Creamery's registration claims. *Id.*

Creamery, by contrast, frames this admission as an opinion
on a matter of law; it says it was "a somewhat compressed
statement of Creamery's position on laches." Creamery dis-
claims any admission of fact in the statement.

The difficulty with Creamery's position is that the request
for admission includes an underlying admission of fact that
traverses both its infringement and registration claims. In its
response, Creamery admits that Smoker did not violate
Creamery's rights until the latter part of the 1995-2000 time
period, which it later identified as 1997. A concession that
there was no actionable infringement by Smoker prior to 1997
necessarily includes a concession that there was no "likeli-
hood of confusion" from Smoker's marketing prior to 1997.
The latter automatically follows from the former because an
actionable infringement claim has one element — a "likeli-
hood of confusion."

Creamery contends that this reasoning suffers from a logical fallacy, arguing that two marks may be "confusingly similar" and still not give rise to an actionable infringement claim (because, for instance, the marks were used in different geographic areas or markets). This misstates the test for infringement. "Confusion, or the likelihood of confusion, *not competition*, is the real test for trademark infringement." *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) (emphasis added). Even in the case of non-competing goods, so long as "the reasonably prudent purchaser [is] *likely to be confused*" between the marks, the trademark owner has a right — and an obligation, in order to avoid laches — to bring an infringement claim. 4 *McCarthy on Trademarks and Unfair Competition* § 24:1 (emphasis added).

**[15]** Creamery's response to Smoker's request for admission was aimed at advancing Creamery's position on laches, but at the same time, it cut the heart out of Creamery's request to cancel the registration of Smoker's "ribbon-design" mark and application to register the "Tillamook Country Smoker" word mark. Smoker used both marks extensively prior to 1997 and those usages, according to Creamery's admission, did not create a likelihood of confusion with Creamery's marks. The district court correctly granted summary judgment to Smoker with respect to the registration claims.

AFFIRMED.