**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MEDTRONIC, INC.,
                    *Plaintiff,*

            and

LOS ANGELES BIOMEDICAL
RESEARCH INSTITUTE AT HARBOR-
UCLA MEDICAL CENTER,
            *Intervenor-Appellant,*

            v.

GEOFFREY WHITE,
            *Defendant-Appellee,*

            v.

EDWARDS LIFESCIENCES LLC;
ENDOGED RESEARCH PTY LIMITED,
            *Third-Party-Plaintiffs.*

No. 06-16229

D.C. No.
CV-04-02201-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
April 15, 2008—San Francisco, California

Filed May 15, 2008

Before: Warren J. Ferguson, Stephen S. Trott, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Trott

5541

**COUNSEL**

Linda F. Callison and Gordon C. Atkinson, Cooley Godward LLP, Palo Alto, California, for the intervenor-appellant.

Mark E. Haddad, Sidley Austin LLP, Los Angeles, California, for the defendant-appellee.

**OPINION**

TROTT, Circuit Judge:

Los Angeles Biomedical Research Institute at Harbor-UCLA Medical Center ("L.A. Biomed") appeals the entry of judgment resulting from a jury verdict in favor of defendant Dr. Geoffrey White in a contract dispute over ownership of a patent. L.A. Biomed alleges that the jury instructions contained a number of prejudicial errors. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand for a new trial.

# I

## BACKGROUND

### Factual Background

L.A. Biomed is a non-profit medical research institute that allows visiting researchers to use its state-of-the-art equipment and facilities. Researchers wishing to use the facilities are generally required to sign a Patent and Copyright Agreement ("P&C Agreement"). In 1985, Dr. White became an assistant professor of surgery at Harbor-UCLA Medical Center and signed L.A. Biomed's P&C Agreement. The P&C Agreement states in pertinent part:

> This agreement is made by me with . . . Harbor-UCLA Medical Center, a non-profit corporation, hereinafter referred to as the "Institute", in part consideration of my employment . . . and/or my utilization of Institute research facilities.

> I understand and agree that *every possibly patentable device, process, or product* hereinafter referred to as "invention", *which I conceive and/or reduce to practice* while employed by the Institute, or during the course of my utilization of any Institute research facilities, *shall be examined by the Institute* to determine rights and equities therein in accordance with the Institute's Patent and Copyright Policy.

> . . . .

> I further agree that, in the event any such invention and/or work shall be deemed by the Institute to be patentable . . . and the Institute desires . . . to seek patent . . . protection therein, I shall execute any documents and do all things necessary . . . to assign to the Institute all rights, title and interest therein and

> to assist the Institute in securing patent . . . protec-
> tion therein. . . .

(emphasis added).

"Conceive" and "reduce to practice" as used in the P&C Agreement are terms of art used in patent and inventorship law. Because these terms are of central importance to understanding the facts and analysis of this case, we define them at the outset.

"Conceive" means, "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994) (internal quotation marks omitted). "Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Id.*

"In order to establish . . . reduction to practice, the inventor must prove that: (1) he constructed [the invention]; and (2) he determined that the invention would work for its intended purpose." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).

Dr. White continued to work at Harbor-UCLA Medical Center until 1989, when he returned to Australia where he is a native and citizen. There, he began exploring endovascular repair of abdominal aortic aneurysms. An aortic aneurysm is the "ballooning" of the aorta that if untreated typically results in rupture and death. Endovascular surgery repairs such aneurysms without invasive surgery by delivering a fabric tube referred to as a graft from an incision in the upper thigh through the femoral artery to the location of the aneurysm, where the graft essentially replaces the ballooning section of the aorta.

By 1992, Dr. White, and his colleague Dr.Weiyun Yu, had begun to develop—and eventually invented—a new device that would make it easier precisely to place a graft into the aorta. The device, referred to generally as a graft attachment device ("GAD"), allows a surgeon to adjust the length of a graft within the aorta by placing one graft inside another and then simply adjusting the overlap between them.

At trial, and now on appeal, the parties hotly disputed when the patented GAD was conceived and reduced to practice by Drs. White and Yu. What seems to be agreed on is that the doctors worked on the development of a GAD in Australia until October 1992 when they first attempted, unsuccessfully, to place a version of it into a patient in Sydney. Dr. White then arranged for him and Dr. Yu to have access to L.A. Biomed's facilities during December 1992 and January 1993 to do certain bench tests and to build and implant miniature versions of the GAD into dogs. Dr. Yu was not asked to and did not sign a P&C Agreement at that or any other time. This fact became part of Dr. White's defense.

Besides performing the aforementioned tests and experiments, during those two months Dr. White also did other testing of the GAD at the VA Long Beach and UC Irvine Hospitals. The two doctors then returned to Australia and continued to work on the GAD's development until October, 1993, when Dr. White returned to the VA Long Beach Hospital and successfully implanted an overlapping GAD-graft into a human.

Without notice to L.A. Biomed, Drs. White and Yu filed for two patents on the GAD in 1998. The patents were issued to them in 2003. *See* U.S. Patent No. 6,582,458 (filed May 1, 1998) (issued June 24, 2003); U.S. Patent No. 6,613,073 (filed Aug. 11, 1998) (issued Sept. 2, 2003). These patents include a number of drawings illustrating the distinct features of the GAD. *See, e.g.*, '458 Patent figs.1-6. As part of the process for obtaining these patents, Dr. White filed in 2000 a

sworn declaration with the U.S. Patent and Trademark Office ("the PTO declaration"), which described the progression of the GAD's development. It stated in pertinent part:

(7) Between 1989 and 1992 I began to develop, with Dr. Weiyun Yu, the [GAD].

(8) In 1992 I came to the United States [and] disclosed to Dr. [Samuel E.] Wilson[1] the types of materials that could be used to make the graft, how the graft was to be assembled and how the aspects of the graft design would function together. . . . I believe that the disclosure made to Dr. Wilson was of sufficient detail that [it] would have enabled one of ordinary skill in the art to make an endovascular graft having such features.

(9) In December of 1992 I undertook bench testing of an endovascular graft having features disclosed in [the patent application]. This bench testing occurred at [L.A. Biomed]. The bench testing included placing an endovascular graft inside another graft and balloon expanding the endovascular graft therein. The grafts used were made by Dr. Weiyun Yu and me, at my instruction, and had the features of a wireform supported prosthesis which could be overlapped with another similar prosthesis. More than twenty grafts were tested and the bench tests indicated that one graft could be supported within another.

---

[1]Dr. Wilson testified about the discussions he had with Dr. White in the early 1990s about the GAD's development. Dr. Wilson was Chief of Surgery at Harbor-UCLA Medical Center in the 1980s when Dr. White worked there. The two doctors apparently maintained a personal friendship and professional confidence. In 1992, Dr. Wilson moved his practice to the University of California, Irvine.

(10) . . . . In September of 1993 . . . I performed a procedure in Sydney, Australia, wherein I repaired a patient's aortic aneurysm using an endovascular graft. . . .

(11) . . . . On October 6, 1993, I performed an endovascular repair of an abdominal aortic aneurysm utilizing an endovascular graft having the features of a wireform supported prosthesis which could be overlapped within another prosthesis. . . .

## Procedural Background

This suit arose out of patent infringement litigation that began after the patents issued. During the infringement litigation, L.A. Biomed intervened in the case when it learned of Dr. White's PTO declaration claiming conclusive testing at its facilities. The district court stayed that litigation until the ownership issues were resolved.

Thus, the trial from which this appeal arises became a contract dispute over the ownership of the GAD patents. Specifically, the issues were whether the P&C Agreement continued to apply to Dr. White in 1992 and 1993 and, if so, whether he had conceived and/or reduced to practice the patented GAD while at L.A. Biomed. At issue also were the legal implications of Dr. Yu's involvement in the process.

L.A. Biomed argued that during December 1992 and January 1993, while at L.A. Biomed, Drs. White and Yu conceived, built, and successfully tested a "Z-ring GAD device" that was materially different from an earlier "O-ring GAD design" developed in Australia. L.A. Biomed claimed that, while using its facilities, Dr. White conceived and/or reduced to practice the patented version of the GAD by inventing and testing four new, distinct features that were central to the ultimate operative invention, which L.A. Biomed refers to as the "Z-ring GAD device." Accordingly, L.A. Biomed argued that

Dr. White was obligated by the P&C Agreement to assign his patent rights to the GAD to L.A. Biomed.

Dr. White, on the other hand, argued that he had no obligation under the P&C Agreement, even if it still applied to him, because by October of 1992, he had already conceived, in Australia, the "Z-ring GAD device" with the same features that L.A. Biomed contended were conceived and tested at L.A. Biomed. Specifically, he argued that while at L.A. Biomed, he and Dr. Yu only rebuilt identical or miniature versions of the GAD already conceived in Australia and repeated tests they had already performed in Australia. He argued also that the GAD was reduced to practice when he successfully implanted it into a patient at the VA Long Beach Hospital in October of 1993.

Both parties submitted numerous versions of their proposed jury instructions. After hearing the parties on the proposed instructions, the district court issued its final jury instructions. The relevant final instructions there, and now at issue on appeal, are those entitled "Work of Dr. Yu," "Conceive," and "Reduce to Practice"[2] (cumulatively, "the disputed instructions").

At the conclusion of the trial, the jury returned a special verdict in favor of Dr. White. Although it found that the P&C Agreement existed between L.A. Biomed and Dr. White at all relevant times, the jury found also that L.A. Biomed had failed to prove that Dr. White had conceived or reduced to practice the GAD during the course of his utilization of L.A. Biomed research facilities. The district court entered judgment on that verdict.

---

[2]While the proposed instruction was titled "Reduction to Practice," the instruction given to the jury was titled "Reduce to Practice." For the sake of clarity and consistency, we refer to the proposed and the final versions of the instruction generically as the "Reduce to Practice" instruction.

## II

## DISCUSSION

### A.  Standard of Review.

"The standard of review on appeal for an alleged error in jury instructions depends on the nature of the claimed error." *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005) (internal quotation marks omitted). "We review de novo whether the instructions misstated the law." *Id.* (internal quotation marks omitted). "We review a district court's formulation of jury instructions in a civil case for abuse of discretion." *Id.* Here, review is de novo because L.A. Biomed alleges misstatements of law.

Where an error in instructing the jury is found, prejudice is presumed and "the burden shifts to the [appellee] to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Galdamez v. Potter*, 415 F.3d 1015, 1025 (9th Cir. 2005) (internal quotation marks omitted).

### B.  The Application of Agency Law to the Exclusion of Patent Law in the Disputed Instructions was Prejudicial Error.

At trial, evidence and testimony pertaining to Dr. Yu's efforts in developing the GAD created questions about whether and to what extent his work at L.A. Biomed's facilities could be used to show a breach of the P&C Agreement by Dr. White. Part of Dr. White's defense was that absent evidence of agency between Dr. White and Dr. Yu, L.A. Biomed had no right to claim any rights in the patented devices that they later conceived or reduced to practice at L.A. Biomed. L.A. Biomed proposed that no agency instruction be given and that the "Conceive" instruction should contain a paragraph summarizing the patent law principle of co-

inventorship—specifically, that an "invention can be conceived jointly" where each inventor "makes a significant contribution to [its] conception."[3] L.A. Biomed proposed further that the "Reduce to Practice" instruction include a paragraph summarizing the similar patent law principle that "[a]cts related to reduction to practice that are performed by a co-inventor . . . should be considered as if they had been performed by the inventor himself."[4] L.A. Biomed stated also in its proposed instructions that, in the alternative, if any agency instruction was given, a model agency instruction should be given. Dr. White proposed a long instruction that applied agency law.

---

[3]The proposed "Conceive" instruction was accompanied by citations to a number of Federal Circuit decisions laying out the applicable principles of patent and inventorship law, including, for example, *Burroughs*, 40 F.3d at 1228-30, and *Fina Oil and Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997). The proposed instruction read:

> The contract between LA Biomed and Dr. White uses the term "conceived." . . . . [Defines "conceive" as it is used in patent law]

> An invention may be conceived jointly. To be a joint inventor, one must make a significant contribution to the conception of the invention. Persons may be inventors even though they do not physically work together or make the same type or amount of contribution, or contribute to the subject matter of each feature of the invention.

[4]The proposed "Reduce to Practice" instruction was accompanied by citations to a number of Federal Circuit decisions laying out the applicable principles of patent and inventorship law, including, for example, *Cooper*, 154 F.3d at 1327, 1331. The relevant part of the proposed instruction read:

> The contract between LA Biomed and Dr. White uses the term "reduced to practice." . . . . [Defines "reduction to practice" as it is used in patent law]

> . . . . [Discusses amount of testing necessary, according to patent law, for "reduction to practice" to have occurred]

> An inventor need not personally reduce to practice his invention. Acts related to reduction to practice that are performed by a co-inventor or a person working with or for the inventor should be considered as if they had been performed by the inventor himself.

The district court eventually decided to give the model agency instruction—entitling it "Work of Dr. Yu"[5] —and not to include the proposed co-inventor language in the "Conceive" and "Reduce to Practice" instructions. The district court opined at the charge conference that the model agency instruction was the best method for dealing with Dr. Yu's contributions to the invention of the GAD because it "seems to capture the points that both sides want to argue without unduly restricting the jury and giving them some structure."

## 1. L.A. Biomed Preserved Its Objections to the Disputed Instructions.

As an initial matter, Dr. White argues that L.A. Biomed waived any objection to the disputed instructions either by failing to object at the charge conference or by later acquiescing to the district court's final instructions.

[1] For an objection to a jury instruction to be valid, the objection must be made "on the record, stating distinctly the

---

[5]The model agency instruction given to the jury read:

Work of Dr. Yu

You have heard testimony about both Dr. Geoffrey White and Dr. Weiyun Yu. Dr. Yu is neither a party to this case nor a signatory to the Patent and Copyright Agreement at issue. L.A. Biomed makes no separate claim against Dr. Yu in this case.

L.A. Biomed claims that Dr. Yu was Dr. White's agent and that Dr. White is therefor responsible for Dr. Yu's conduct with respect to the Patent and Copyright Agreement.

If L.A. Biomed proves that Dr. White gave Dr. Yu authority to act on his behalf, then Dr. Yu was Dr. White's agent. This authority may be shown by words or may be implied by the parties' conduct. This authority cannot be shown by the words of Dr. Yu alone.

If L.A. Biomed does not prove that Dr. Yu was Dr. White's agent, you should not consider Dr. Yu's conduct in reaching your decision.

matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1). In its proposed jury instructions L.A. Biomed stated clearly its position that "no agency instruction should be given as an agency instruction is irrelevant and confusing. L.A. Biomed submits that the effect of [Drs. Yu and White's] collaboration is more appropriately addressed in L.A. Biomed's proposed conception and reduction to practice instruction[s]." At the charge conference, L.A. Biomed's counsel distinctly stated her objection to the application of agency law, instead of patent law, in both the "Work of Dr. Yu" and "Reduce to Practice" instructions. Thus, L.A. Biomed preserved for appeal its objection to these two instructions.

Dr. White argues also that L.A. Biomed waived its objection by acquiescing to the "Conceive" instruction when its counsel responded at the charge conference, "I think that's fine," after the district court read the version that was ultimately presented to the jury. Although "[t]his court has enjoyed a reputation as the strictest enforcer of Rule 51," we recognize a limited exception "[w]here the district court is aware of a party's concerns and further objection would be unavailing." *Glover v. BIC Corp.*, 6 F.3d 1318, 1326 (9th Cir. 1993) (internal quotation marks omitted). The exception is available "when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction." *Id.* (internal quotation marks omitted).

**[2]** At trial, after L.A. Biomed submitted its proposed instructions but prior to L.A. Biomed's alleged acquiescence, the district court had rejected the co-inventorship language from the "Conceive" instruction. Specifically, the court stated, "I was concerned when I was reading some of the proposed . . . instructions on this issue that we were kind of slopping over into . . . inventorship, co-inventorship, which is a totally different body of law that this jury is not going to be consider-

ing." Thus it is clear that the district court was aware of L.A. Biomed's disagreement with the "Conceive" instruction and that further objection at the charge conference would have been unavailing.[6] Therefore, we conclude that L.A. Biomed's objection to the "Conceive" instruction was preserved. *See id.*

## 2. The Disputed Instructions Were Given In Error Because the P&C Agreement Required the Application of Patent Law.

[3] L.A. Biomed argues that the district court erred by not including the co-inventorship language in the jury instructions because the dispute is over the ownership of a patent and is rooted in a contract that dictates that patent and inventorship law should control its interpretation. L.A. Biomed correctly points out that under the settled law of inventorship, each co-inventor who makes a significant contribution to an invention owns an undivided interest in the corresponding patent. *See, e.g.*, *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1465 (Fed. Cir. 1998); *Fina Oil*, 123 F.3d at 1473. L.A. Biomed thus argues that the agency instruction was given in error because the issue was not whether Dr. Yu acted as Dr. White's agent, but whether Dr. White made a substantial contribution to the conception of an invention while using its facilities.

Dr. White, on the other hand, argues that giving an instruction applying agency law was perfectly appropriate in this breach of contract case where the contract at issue pertains only to inventions Dr. White conceived and/or reduced to practice while utilizing L.A. Biomed's facilities.

---

[6]It is also worth noting that at the beginning of the charge conference, and prior to the alleged acquiescence, the district court stated, "any instruction that [was] requested that I don't give [is] deemed . . . preserved, and you don't need to reassert those. So my order is that . . . those objections and requests will be preserved just by virtue of having requested those instructions."

**[4]** We first acknowledge that "issues of patent ownership are distinct from questions of inventorship." *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007) (hereinafter "*IBEP*"). Additionally, we recognize that the California Court of Appeal has held that "the trial court correctly applied contract principles in resolving [a] dispute over [a] patent agreement" nearly identical to the P&C Agreement. *Shaw v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 2d 850, 854 (Cal. Ct. App. 1997).

In *Shaw*, a professor sued the University of California when it instituted a new patent policy that reduced the percentage of net royalties payable to him under the patent agreement he signed when he began his employment. *Id.* at 851. One of the central issues was whether the district court erred in applying contract law "rather than the standard of review for a mandamus action." *Id.* at 854. California's Court of Appeal found that contract law applied and looked to the language of the contract to determine "the meaning and effect of the patent agreement." *Id.* at 855.

Thus, we turn to the language of the P&C Agreement to determine whether the parties intended for the rules of inventorship or the rules of agency to apply.

**[5]** First, we note that this contract employed a number of terms that reflect well settled principles of patent and inventorship law such as "conceive" and "reduce to practice." Additionally, L.A. Biomed's P&C Policy reflects principles of patent and inventorship law. Parties may incorporate the terms of other documents into a contract "so long as [the contract] guides the reader to the incorporated document." *Id.* at 856 (internal quotation marks and alteration omitted). The P&C Agreement states that "every possibly patentable device . . . . shall be examined by L.A. Biomed to determine rights and equities therein in accordance with L.A. Biomed's Patent and Copyright Policy." This is sufficient to incorporate the P&C Policy into the P&C Agreement. *See id.*

**[6]** L.A. Biomed's P&C Policy states: "In its consideration of matters relating to each particular patent . . . case or situation, [LAB's] Patent Board shall take into consideration the principles laid down in the patent . . . laws and in the court decisions of the United States." This strongly indicates that the parties intended for patent law to be applied when determining patent ownership rights and equities.

**[7]** Therefore, we conclude that the pertinent language of the contract indicates convincingly that the parties intended for patent law to apply in interpreting the P&C Agreement. Consequently, we conclude that it was clear error for the district court to give the agency instruction and to exclude the co-inventorship language proposed by L.A. Biomed. Agency was a red herring.

Because we find that the disputed instructions misstated the law, we presume prejudice and the burden shifts to Dr. White "to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Galdamez*, 415 F.3d at 1025 (internal quotation marks omitted). We conclude that Dr. White did not meet this burden and that the error was prejudicial because it allowed the jury to decide the case on a legally impermissible ground —specifically, a reasonable juror could have found that Drs. White and Yu conceived or reduced to practice the patented GAD at L.A. Biomed but still would have been compelled nonetheless to return a verdict for Dr. White if they found, as Dr. White argued, that Dr. Yu was not acting as his agent. *See Heller v. EBB Auto Co.*, 8 F.3d 1433, 1441 (9th Cir. 1993) (reversing and remanding a jury verdict where the jury could have based its verdict on a finding inconsistent with the law due to the district court's erroneous instruction).

Dr. White now contends that Dr. Yu's role was a side note to the centerpiece of his defense that the GAD was conceived in Australia and reduced to practice at the VA Long Beach Hospital. This assertion and the record, however, are insuffi-

cient to carry Dr. White's burden. For example, at closing Dr. White's counsel argued to the jury that Dr. Yu's efforts were independent of Dr. White's. He argued, "What did Dr. Yu tell you when he sat in the stand? These were his designs. His designs. He builds the grafts. He designed the wireforms." He went on to argue that Dr. Yu "clearly was working on his own. He clearly designed these devices." This is enough to show that the instructional error was not harmless. *See Gizoni v. Sw. Marine Inc.*, 56 F.3d 1138, 1141-42 (9th Cir. 1995) (finding error in jury instruction prejudicial "in light of [appellee's] closing arguments").

Because the agency instruction combined with the absence of a recitation of settled co-inventorship law was error, and because Dr. White has failed to demonstrate that the error was more probably than not harmless, we reverse the district court's judgment and remand this case to the district court for a new trial consistent with this opinion.

## C. The "Corroboration Instruction" was Prejudicial Error.

L.A. Biomed alleges that the final paragraph of the "Reduce To Practice" instruction ("the corroboration instruction") erroneously misstated the law because it failed to inform the jury that any admission against interest by Dr. White need not be corroborated by independent evidence. L.A. Biomed is correct. The first sentence of the corroboration instruction summarizes an accepted principle of patent and inventorship law: "To prove reduction to practice by testimony from a person who claims to have reduced to practice a device, that testimony must be corroborated by independent evidence." *See, e.g.*, *Cooper*, 154 F.3d at 1330. The instruction goes on to explain what is sufficient corroborating evidence. L.A. Biomed argues not that the corroboration instruction itself misstates the law, but that the district court misstated the law by failing to acknowledge that an inventor's admissions-against-interest need not be corroborated.

**[8]** We conclude that the corroboration instruction was given in error. The Federal Circuit's predecessor court has held that in a dispute over the date of conception of an invention, "all that is necessary to constitute an admission is a previous statement by an adversary party which is inconsistent with the position he is taking in litigation." *Technitrol, Inc. v. United States*, 440 F.2d 1362, 1370 (Ct. Cl. 1971). In other words, although corroborating evidence is required *of an inventor* pursuing a patent to prove the date of conception or reduction to practice of an invention, such corroborating evidence is not required when offered *by an adversary party against an inventor* as an admission-against interest.

**[9]** Thus, we conclude that the corroboration instruction, without a corresponding admission against interest instruction, was given in error because it misstated the law by requiring corroborating evidence.[7]

Furthermore, we conclude that this instruction was prejudicial. In the PTO declaration, Dr. White stated that he performed bench testing at L.A. Biomed on a version of the GAD that "had the features of a wireform supported prosthesis which could be overlapped with another similar prosthesis"—one of the features L.A. Biomed argued was central to the invention of the "Z-ring GAD device." He stated further in the PTO declaration that "the bench tests indicated that one graft could be supported within another."

**[10]** Dr. White argues that this was not an admission against interest and thus could not be prejudicial because the PTO declaration was consistent with his position at trial. We disagree, however, and conclude that a reasonable juror could have found that this statement from the PTO declaration constituted at least some convincing evidence that Dr. White conceived and/or reduced to practice the patented GAD at L.A.

---

[7]We have considered Dr. White's other arguments on this issue and determined that they are without merit.

Biomed. Yet, the corroboration instruction inappropriately prohibited the jury from making such a finding unless there was also sufficient independent corroborating evidence supporting it. Thus, because a reasonable juror could have based a verdict in favor of L.A. Biomed on Dr. White's declaration in the absence of the corroboration instruction, we conclude that it was prejudicial and a new trial is necessary for this reason as well. *See Heller*, 8 F.3d at 1441.

### D.   The Identification of the Invention.

L.A. Biomed complains that the district court improperly blurred an important distinction between Dr. White's "O-ring GAD design" and the successful "Z-ring GAD device" when the court held that L.A. Biomed's contract claim would be limited to whether Dr. White invented an "overlapping GAD-graft device" at L.A. Biomed. Given the exact terms of the agreement Dr. White signed, which required him to disclose "every possible patentable device," this contention has merit. It is clear that more precise jury instructions on this central point of contention needed to have been given.

We leave the rectification of this issue to the district court on remand. However, given the parties' manifest willingness endlessly to dispute on appeal who argued what and when, and who presented what in the multiple conferences on instructions, we would advise both the district court and the parties—now that they will have a fresh start—to take great care to respect Rule 51 and to leave nothing either to inference or to the imagination. We recognize the convoluted history of this case in the trial court, but it turns out that allowing the parties to "deem preserved" previous objections created an unnecessary Rule 51 battlefield on appeal.

## III

## CONCLUSION

Because we conclude that both the agency instruction and the corroboration instruction were given in error and that each

was prejudicial, we **REVERSE** and **REMAND** to the district court for a new trial consistent with this opinion.

   **REVERSED and REMANDED.**