**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERNET SPECIALTIES WEST, INC., a
California corporation,
             *Plaintiff-Appellee,*

v.

MILON-DIGIORGIO ENTERPRISES,
INC., a California corporation,
             *Defendant-Appellant.*

No. 07-55087

D.C. No.
CV-05-03296-FMC

INTERNET SPECIALTIES WEST, INC., a
California corporation,
             *Plaintiff-Appellant,*

v.

ISPWEST, a California company;
MILON-DIGIORGIO ENTERPRISES INC.,
a California corporation; ACEWEB
INTERNET, a California company,
             *Defendants-Appellees.*

No. 07-55199

D.C. No.
CV-05-03296-FMC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
September 8, 2008—Pasadena, California

Filed March 17, 2009

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Johnnie B. Rawlinson, Circuit Judges.

3401

Opinion by Judge B. Fletcher;
Dissent by Judge Kleinfeld

**COUNSEL**

William E. Lloyd, Jr., Law Office of William E. Lloyd, Beverly Hills, California, for defendant-appellant Milon-DiGiorgio Enterprises, Inc.

Jason H. Wilson, Willenken Wilson Loh & Lieb, LLP, Los Angeles, California, for plaintiff-appellee Internet Specialties West, Inc.

**OPINION**

B. FLETCHER, Circuit Judge:

Milon-Digiorgio Enterprises, Inc. ("MDE") appeals the district court's grant of an injunction against any further use of its registered domain name, "ISPWest.com." MDE asserts three challenges to the injunction: 1) that the jury's finding of trademark infringement, which gave rise to the injunction, was the result of an improper jury instruction; 2) that the district court erred in finding that the plaintiff's claim was not barred by laches; and 3) that the injunction is overbroad. We find that each of these claims fails, and affirm the district court's grant of the injunction.

## I.  CHRONOLOGY

Internet Specialties West ("Internet Specialties") and MDE are both internet service providers offering substantially similar services, including internet access, e-mail, and web-hosting. Internet Specialties uses the domain name "IS-West.com", which it registered in May of 1996. MDE uses

the domain name "ISPWest.com", which it registered in July of 1998.

Internet Specialties became aware of ISPWest's existence in late 1998. At that time, the companies did not offer equal services: Internet Specialties offered dial-up, DSL and T-1 internet access nationwide, whereas MDE offered only dial-up internet access and only in southern California. Internet Specialties' CEO testified that his company was not concerned about competition from MDE at that time, because it did not offer DSL and because the general market for internet technology start-ups was so volatile that most companies were expected to go out of business.

MDE expanded to nation-wide service in 2002, and began offering DSL in mid-2004. Both parties agree that the shift from supplying dial-up to supplying DSL was a "natural and gradual technological evolution" which was necessary for MDE to stay in business. However, this evolution triggered action by Internet Specialties. In 2005, after giving MDE a cease-and-desist letter, Internet Specialties brought suit alleging that MDE's use of the name "ISPWest" constituted trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).[1]

The trial was bifurcated. In the first phase, the jury found that MDE had infringed on Internet Specialties' trademark,

---

[1] Section 43(a) of the Lanham Act provides: "Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1).

but found no damages from the infringement. In the second phase, the district court ruled that MDE did not have a laches defense to the action. Accordingly, the court issued an injunction against the use of the name ISPWest.

MDE moved for a new trial that the district court denied. MDE appeals the jury's findings, the district court's findings, and the scope of the injunction.

## II.   JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §1331 and §1338. The district court entered its Judgment and Permanent Injunction on November 14, 2006. The district court denied MDE's motion for a new trial on December 18, 2006. The Notice of Appeal was timely filed on January 17, 2007. This court has jurisdiction under 28 U.S.C. §1291.

## III.   ANALYSIS

### A.   Jury Instruction 18.15

First we consider MDE's contention that jury instruction 18.15 was improper and prejudiced the jury in favor of Internet Specialties on its trademark infringement claim. We review de novo a district court's statement of the law, but its formulation of the instructions for abuse of discretion. *Medtronic, Inc. v. White*, 526 F.3d 487, 493 (9th Cir. 2008) ("We review de novo whether the instructions misstated the law. We review a district court's formulation of jury instructions in a civil case for abuse of discretion.") (internal quotation marks omitted). We hold that instruction 18.15 correctly states the law and is appropriately formulated.

[1] Jury instruction 18.15 followed the Model Civil Instructions by identifying the elements of trademark infringement, and by listing the eight *Sleekcraft* factors under the element of likelihood of confusion. *See, e.g.*, *AMF Inc. v. Sleekcraft*

*Boats*, 599 F.2d 341 (9th Cir. 1979). After listing these factors, however, 18.15 departed from the Model Instructions by stating the following:

> In an Internet case such as this one, the law considers three of these factors to be of greatest importance: (i) similarity of plaintiff's and defendant's mark; (ii) relatedness of services; and (iii) simultaneous use of the Internet as a marketing channel.
>
> Therefore, if you find that the names "ISWest" and "ISPWest" are confusingly similar, and that the services offered by the plaintiff and defendant are related, and that both the plaintiff and the defendant use the Internet as a marketing channel, then you should find that the plaintiff has proven there is a likelihood of confusion as I have instructed you unless you find that the remaining factors weigh strongly in the defendant's favor.

This instruction is an accurate reflection of the law of our circuit, which places greater import on the "Internet Troika" factors in internet cases. *Interstellar Starship Svcs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002); *GOTO.com, Inc. v. Disney*, 202 F.3d 1199, 1205 (9th Cir. 2000). The instruction did not, as MDE contends, mislead the jury as to the source of these factors; the phrase "three *of these* factors" clearly refers to the eight *Sleekcraft* factors discussed immediately prior to the sentence at issue. Finally, the phrase "as I have instructed you", taken in context, was not an attempt to direct the jury to find for the plaintiff. Instead, it merely refers back to the judge's preceeding instructions on the likelihood of confusion.

**[2]** Therefore, we reject MDE's claim that jury instruction 18.15 was improper. Accordingly, we do not need to consider Internet Specialties' assertion that MDE failed to preserve this issue for appeal.

## B.  Laches

**[3]** Next, we turn to whether the district court erred in determining that laches did not bar Internet Specialties' trademark infringement claim. Laches is an equitable defense to Lanham Act claims. *GOTO.com*, 202 F.3d at 1209. This defense embodies the principle that a plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights. *Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1102-03 (9th Cir. 2004).

**[4]** The test for laches is two-fold: first, was the plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the delay? *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002); *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*, 465 F.3d 1102, 1108 (9th Cir. 2006). As to whether Internet Specialties was diligent, we must first decide whether it filed suit within the applicable four-year statute-of-limitations period, thereby creating a presumption against laches.[2] *See Jarrow,* 304 F.3d at 835-36 ("If the Plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable. However, if suit is filed outside of the analogous limitations period, courts often have presumed that laches is applicable.") The parties dispute the correct starting date for the laches period. The district court found in favor of Internet Specialties, holding that the period started in 2004 when MDE began offering DSL, rather than in 1998 when Internet Specialties gained actual knowledge of MDE's existence.

---

[2]"[A] laches determination is made with reference to the limitations period for the analogous action at law." *Jarrow*, 304 F.3d at 835. Neither party disputes the imputation of the four-year limitations period from California trademark infringement law, and we agree that this was the correct period to use.

There is an intracircuit conflict about the correct standard of review for a district court's determination of the starting date for laches. In *Jarrow*, the appellate court reviewed the laches determination as a whole, including the starting date, under a clear error/abuse of discretion hybrid (discussed below). 304 F.3d at 833-34; *see also Grupo Gigante*, 391 F.3d at 1102 (applying hybrid review from *Jarrow* to entire laches review). However, a more recent case held that a district court's decision on the narrow issue of the starting date is reviewed *de novo*, while giving deference to the ultimate decision on whether laches applied. *Tillamook*, 465 F.3d at 1109 ("In an analogous circumstance, the question of when the statute of limitations begins to run for an action at law is reviewed de novo. De novo review is thus appropriate here.") We need not resolve this inconsistency because we would reach the same result under either standard of review.

**[5]** The limitations period for laches starts when the plaintiff "knew or should have known about its potential cause of action." *Tillamook*, 465 F.3d at 1108; *see also Jarrow*, 304 F.3d at 838. In this case, the potential cause of action was a trademark infringement claim. The essence of such a claim centers on the likelihood of confusion between two marks or products. *GOTO.com, Inc. v. Disney*, 202 F.3d 1199, 1205 (9th Cir. 2000) ("The likelihood of confusion is the central element of trademark infringement."); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) ("The core element of trademark infringement is the likelihood of confusion."). Thus, the question is when Internet Specialties knew or should have known about the likelihood of confusion between its mark and MDE's mark.

**[6]** On this issue, we disagree with the district court. While it is true that MDE did not offer DSL in 1998, both companies did offer internet access, e-mail, and web hosting in the same geographic area under remarkably similar names. A prudent business person should recognize the likelihood of confusion

to consumers under such circumstances as existed in 1998. Therefore, we find that the laches period started in 1998. Accordingly, the presumption of laches does apply, because Internet Specialties did not file suit until after the four-year period had expired.

This, however, does not end the inquiry. We must still decide whether laches precludes Internet Specialties' claim, bearing in mind the presumption in favor of laches. In our circuit, we apply a "hybrid" standard of review in this circumstance, reviewing de novo whether laches is a valid defense to a particular action, but reviewing the district court's application of the laches factors for abuse of discretion. *Jarrow*, 304 F.3d at 834; *Grupo Gigante*, 391 F.3d at 1101; *Tillamook*, 465 F.3d 1109.

[7] The district court appropriately applied the six "*E-Systems* factors" in its laches review.[3] We take issue only with its decision regarding the second factor: plaintiff's diligence in enforcing its mark. Internet Specialties knew, or should have known, about the likelihood of confusion between the domain names "ISWest.com" and "ISPWest.com" in 1998. Its argument that MDE "progressively encroached" on its market when it shifted from offering dial-up access to DSL access is without merit. Offering DSL was not an expansion into a new market, but rather a natural growth of its existing business. "A junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Tillamook*, 465 F.3d 1110. In *Grupo Gigante*, we rejected a progressive encroachment argument where the plaintiff knew of the potential conflict several years

---

[3]The six factors are: "1) the strength and value of trademark rights asserted; 2) plaintiff's diligence in enforcing mark; 3) harm to senior user if relief denied; 4) good faith ignorance by junior users; 5) competition between senior and junior users; and 6) extent of harm suffered by junior user because of senior user's delay." *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

before bringing suit; the fact that it chose to wait until the conflict was actual, versus potential, was not an excuse and did not constitute progressive encroachment. 391 F.3d at 1103. The same reasoning applies here. Internet Specialties was not entitled to wait until MDE's business grew large enough to constitute a real threat, and then sue for trademark infringement. Therefore, we find that the district court erred in its conclusion that Internet Specialties was diligent, the second *E-Systems* factor.

However, MDE must still satisfy the second prong of the laches test: prejudice resulting from Internet Specialties' unreasonable delay in bringing suit. *See Jarrow*, 304 F.3d at 839 (holding that after a finding of unreasonable delay, laches would not apply unless defendant also demonstrated prejudice). The dissent views this as an open-and-shut case of prejudice, because MDE "continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights." Dissent p. 3420, quoting *Grupo Gigante*, 391 F.3d at 1105. The dissent would hold that the expansion from 2,000 customers to 13,000 customers, along with the accompanying sales and expenses, constitutes prejudice. Dissent p. 3421.

**[8]** While we are sympathetic to MDE's position, the meaning of prejudice in this context is not so simple. "If this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay." *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965). Laches is meant to protect an infringer whose efforts have been aimed at "build[ing] a valuable business *around its trademark*" and "an important reliance *on the publicity of [its] mark*." 6 McCarthy on Trademarks and Unfair Competition § 31:12 (citations omitted) (emphases added). Therefore, we feel compelled to analyze whether MDE's claim of prejudice is based on "mere[ ] expenditures in promoting the infringed name," *Tisch Hotels*, 350 F.2d at 615, or whether it is based on an

investment in the mark ISPWest as the identity of the business in the minds of the public. *See Jarrow*, 304 F.3d 835-36 (finding prejudice where had the plaintiff "filed suit sooner, [the infringer] could have invested resources in an alternative identity . . . in the minds of the public.")

**[9]** We find that the district court's opinion, to which we owe some deference under the abuse of discretion standard, answers this question. The district court held that MDE did not demonstrate prejudice from Internet Specialties' delay in bringing suit, because MDE did not spend the time in the interim developing brand recognition of its mark. The uncontested evidence at trial showed that the vast majority of MDE's advertising took the form of "pay-per-click" advertisements, through which potential customers are funneled to MDE's website based on their interest in a particular type of service (i.e., internet services in Southern California). Such advertising creates little to no brand awareness. Furthermore, MDE typically did not even include the name ISPWest in the pay-per-click advertisements.[4] It is a simple premise that MDE cannot create "public association" between ISPWest and the company if it does not even use the ISPWest mark in its most prevalent form of advertising.

It is true, as the dissent points out, that MDE's customers will be forced to change their e-mail addresses, and that now 13,000 people must change, as opposed to 2,000. However, the district court found that MDE had not shown that it would have to undertake significant advertising expenditures to change its name at this juncture. To the contrary, the evidence showed that MDE had successfully changed its name in the past, that internet service providers frequently change their names due to consolidations and mergers, and that the additional costs of registering a new domain name are minimal.

---

[4]For example, in 7,592 Yahoo! pay-per-click ads, MDE only used the name ISPWest 18 times.

We do not think that our view of prejudice constitutes a defiance of circuit precedent, as the dissent characterizes it. Our laches cases have consistently included an analysis of whether, during plaintiff's delay in bringing suit, the infringer developed an identity as a business based on its mark. For instance, in *Jarrow Formulas*, plaintiff Jarrow challenged certain health claims on defendant Nutrition Now's product, a health supplement called PB8. *Jarrow*, 304 F.3d 829, 832. Jarrow argued the health claims were false and misleading advertising under the Lanham Act, but we held that Jarrow's suit was barred by laches. Our finding of prejudice expressly rested on the public association that Nutrition Now had built between the health claims and its product.

> Nutrition Now has closely tied the challenged claims to PB8 since initial distribution in 1985. Nutrition Now has always prominently displayed the claims on PB8's product label. Nutrition Now has also used the claims as a central part of its extensive marketing campaign . . . At bottom, Nutrition Now has invested enormous resources in trying PB8's identity to the challenged claims.

*Id.* at 839. Thus, *Jarrow*'s analysis of prejudice probed deeper than simply whether Nutrition Now had spent money expanding its business. We are compelled to do the same.

Similarly, our holding in *Grupo Gigante* was that a defendant can show prejudice "by proving that it has continued to build a valuable business *around its trademark* during the time that the plaintiff delayed the exercise of its legal rights." 391 F.3d at 1105, emphasis added. We found that the defendant was prejudiced where it had operated two grocery stores, with the infringing name prominently displayed at the entrance, for four years after plaintiff discovered the infringement. *Id.* There is a significant difference between the public association of a grocery store and its name, versus the public association of MDE and ISPWest. A grocery store's very

identity rests in its name. MDE failed to show at trial that its identity had much at all to do with the mark ISPWest, inasmuch as MDE did not rely on its mark to attract customers.

**[10]** In conclusion, we find no error or abuse of discretion in the district court's finding that MDE was not prejudiced within the meaning of a trademark infringement claim. Thus, laches does not bar Internet Specialties lawsuit.

## C.   Scope of the Injunction

**[11]** Finally, we must decide whether the district court's injunction is overbroad. We review a district court's grant or denial of an injunction, as well as the scope of the injunction, for abuse of discretion. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1296 (9th Cir. 1992); *Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 653 (9th Cir. 2002).

Under the district court's order, MDE is enjoined from:

> [u]tilizing any of ISWest's marks or any variation, derivative, or shorthand notation thereof, or any terms similar thereto, including ISPWest, in connection with any product or service, or sham products or services, in any medium, which would give rise to a likelihood of confusion as to the source of such products or services.

MDE contends that even if it cannot use its mark to market DSL services, it should not be prohibited from using it to market its other services which did not prompt Internet Specialties' lawsuit. We find the scope of the injunction appropriate. The essence of trademark infringement is the likelihood of confusion, and an injunction should be fashioned to prevent just that.[5] We find no abuse in the district court's determina-

---

[5]The likelihood of confusion to consumers is the critical factor in our consideration of both laches and the breadth of the injunction. The public

tion that, in order to avoid confusion to consumers, MDE must abandon all use of the name "ISPWest.com."

**[12]** A plaintiff seeking an injunction must establish that the injunction is in the public interest. *Winter v. NRDC, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 381-82 (2008), *rev'g* 518 F.3d 658 (9th Cir. 2008). The wording of the district court's injunction reflects the usual public interest concern in trademark cases: avoiding confusion to consumers. The dissent would hold that a second type of public interest — the burden imposed on the public by the injunction — defeats this injunction. The dissent cites only to *Winter*, in which the Supreme Court held that the public interest in national security defeated an injunction against certain Navy training excercises. Dissent p. 3425, citing *Winter*, 129 S. Ct. at 377. We do not see a sufficient similarity between the public interest in national security and the particularized interest of MDE's 13,000 customers that would justify overturning this injunction on the grounds that it burdens the public.

### D.    Conclusion

Since we affirm the district court's findings in Internet Specialties' favor, we do not reach the issues of unclean hands or Internet Specialties' cross appeal on its state law claim.

**AFFIRMED.**

---

has an interest in avoiding confusion between two companies' products. Even if a defendant can show unreasonable delay and prejudice, laches will not apply to bar a suit if the public has an overriding interest in having the suit proceed. *Jarrow*, 304 F.3d at 840. Were we to find that laches applied, we would have to consider whether the public interest nonetheless justified proceeding with the suit. Because we have concluded that laches does not apply, we do not need to pursue this analysis.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

"[E]quity aids the vigilant, not those who slumber on their rights, or *Vigilantibus non dormientibus, aequitas subvenit* . . . ."[1]

The majority opinion could have used what Learned Hand wrote about prejudice, and left it at that:

> [the plaintiff] did nothing; not a word of protest, or gesture of complaint, escaped it for six years more; and still [defendant's business] kept increasing. What equity it can have the hardihood now to assert; how it can expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed for years to grow like the mustard tree; why we should destroy a huge business built up with its connivance and consent: this we find it impossible to understand.[2]

I concur in most of the steps of the majority's analysis, as stated below. But when the majority gets to prejudice, the majority defies circuit precedent,[3] and for no equitable reason that I can see. And when the majority reaches injunction law, it defies Supreme Court precedent.[4] We have now enunciated

[1]John Norton Pomeroy, I *A Treatise on Equity Jurisprudence*, § 364 (2d ed. 1899); *see also Ricard v. Williams*, 20 U.S. (7 Wheat.) 59, 116 (1822) (Story, J.).

[2]*Dwinell-Wright Co. v. White House Milk Co.*,132 F.2d 822, 825-26 (2d Cir. 1943).

[3]*Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004) (citing 5 *McCarthy on Trademarks and Unfair Competition* § 31:12 at 31-42 & n.4 (4th ed. 2002)); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837-38 (9th Cir. 2002); *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984).

[4]*Winter v. NRDC, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 381 (2008).

a new and unfair standard for prejudice in trademark law. The majority gives no good reason why.

The key, and new, holding is "[i]f this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay"[5] applied in this case to a time period well in excess of the analogous statute of limitations period (6 years compared with 4) and exponential increases in business and business-building expenses around a trademark (438% increase in general business expenses and a 14,931% increase in advertising expenditures). Notably, the language the majority uses in its holding comes from a case where the delay was less than a year,[6] the infringement was deliberate,[7] and in which longer periods of delay were distinguished.[8] The practical effect of this new rule is to eviscerate the defense of laches in trademark law.

## I.  Facts

The critical dates in this case are 1998, when Internet Specialties West, Inc. (Internet Specialties) discovered that Milon-DiGiorgio Enterprises, Inc. was using a domain name similar to its own, and 2005, when it finally did something about Milon DiGiorgio's innocent infringement. Internet Specialties waited more than 6 years before writing a cease and desist letter and then filing suit. No one contends that Milon-DiGiorgio's infringement was willful. The only willful decision was by Internet Specialties, who let things ride in the hope that its competitor would go out of business.

---

[5]Majority Op. at 3412 (quoting *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965).

[6]*Tisch*, 350 F.2d at 610 (the infringement was discovered late in 1960 and the defendants sent a cease and desist letter in August 1961).

[7]*Id.* at 613, 615.

[8]*Id.* at 615.

When Internet Specialties discovered Milon-DiGiorgio's unwittingly infringing ISPWest domain name in 1998, ISP-West had about 2,000 customers. In 2002, Internet Specialties again had the infringement brought to its awareness. Someone called Internet Specialties to collect on a bill thought to be owed by ISPWest. Thus, Internet Specialties knew both that ISPWest was infringing and, from this and a few other calls, that the infringement caused confusion. Yet Internet Specialties still did not even trouble itself to send a cease and desist letter to ISPWest.

In mid-2004, almost 6 years after Internet Specialties discovered ISPWest's infringement, ISPWest began offering DSL service in addition to dialup, i.e., much faster upload and download speeds. Internet Specialties found out. Still, no action. Finally, a few months later, in 2005, Internet Specialties sent a cease and desist letter to ISPWest and filed this lawsuit.

Internet Specialties' first claim of infringement and demand that ISPWest stop its activities was more than 6 years after Internet Specialties knew that ISPWest was infringing on its trademark. ISPWest had meanwhile grown from 2,000 customers to 13,000, by dint of over $1.5 million in marketing expenses.

## II.   Analysis

The majority opinion is correct up to the discussion of prejudice. We are agreed that: (1) jury instruction 18.15 was not an abuse of discretion; (2) "[t]he limitations period for laches starts 'from the time that the plaintiff knew or should have known about its potential cause of action;' "[9] (3) the two com-

---

[9]*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (*quoting ProFitness Phys. Therapy Ctr. v. Pro-Fit Orthopedic and Sports Phys. Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002)).

panies offered similar enough services that Internet Specialties should have recognized the likelihood of confusion in 1998, when it became aware that ISPWest was providing Internet access, e-mail, and web-hosting; (4) Internet Specialties' progressive encroachment argument is foreclosed by *Grupo Gigante S.A. de C.V. v. Dallo & Co.*[10] and *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*[11] because they were not entitled to wait until ISPWest's business grew large enough to constitute a real threat to Internet Specialties; (5) Internet Specialties was not diligent;[12] (6) Internet Specialties did not file suit within the analogous 4-year statute of limitations period and therefore, a presumption in favor of laches applies;[13] and (7) Internet Specialties' delay in bringing suit was unreasonable, so laches bars equitable remedies unless there was no prejudice to ISPWest as a result of the delay.[14]

We part ways on prejudice and on the majority's affirmance of the injunction.

## A.   Laches

Ninth Circuit law, and the law of our sister circuits, has long held that prejudice is established when the party asserting laches "prov[es] that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights."[15] That was proved

---

[10]391 F.3d 1088, 1103 (9th Cir. 2004).

[11]465 F.3d at 1110.

[12]*See id*; *Grupo Gigante*, 391 F.3d at 1103.

[13]*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.2d 829, 835-36 (9th Cir. 2002).

[14]*Id.* at 838.

[15]*Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004) (citing 5 *McCarthy on Trademarks and Unfair Competition* § 31:12 at 31-42 & n.4 (4th ed. 2002)); *see also, e.g.*, *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) (detrimental reliance

here. In 1998, ISPWest had 2,000 customers. In 2004, it had 13,000. In 1998, ISPWest had $518,848 in sales. In 2004, it had $2,422,463 in sales. At the heart of this expansion was the use of the trademark, ISPWest. Customers received "@isp-west" e-mail addresses and used the ISPWest domain name. All this expansion happened while Internet Specialties knew about the infringement and did nothing to stop it. Until today, ISPWest's five or sixfold expansion of its business would have been more than enough to establish prejudice.

As the majority concedes, *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, establishes that laches is presumed to bar a claim made outside of the analogous limitations period, 4 years here.[16] The district court did not apply this presumption because, as the majority holds, it failed to determine the proper period for laches.[17] In fact, the district court applied a presumption against laches. Accordingly, the district court necessarily committed an abuse of discretion on this issue, and we cannot properly defer to its discretion. The majority's deferential review is erroneous.

We extensively considered laches in *Grupo Gigante*, a trademark case in which the plaintiff's delay was only 4 years, not 6 as in the case at bar.[18] We held that prejudice is

---

found in merely continuing a business, "incurring additional potential liability" by reason of the plaintiff's delay); *Hylo Co. v. Jean Patou, Inc.*, 215 F.2d 282, 284 (C.C.P.A. 1954); *Anheuser-Busch, Inc. v. Du Bois Brewing Co.*, 175 F.2d 370, 375 (3d Cir. 1949) (prejudice established by defendant's advertising expenses and local goodwill); *Pro-Football, Inc. v. Harjou*, 284 F. Supp. 2d 96, 143 (D.D.C. 2003) ("[P]rejudice is equated with investment in the trademark that theoretically could have been diverted elsewhere had the suit been brought sooner."), *remanded on an alternative ground Pro-Football, Inc. v. Harjo* 415 F.3d 44 (D.C. Cir. 2005); *Haviland & Co. v. Johann Haviland China Corp.*, 269 F. Supp. 928, 956 (S.D.N.Y. 1967).

[16]304 F.3d 829, 835-36 (9th Cir. 2002).

[17]Majority Op. at 3410-11.

[18]*Grupo Gigante*, 391 F.3d at 1105.

established (and was in that case) when the party asserting laches "has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights."[19] We are obligated to follow circuit precedent, so this rule controls and resolves the case. We did not require, in *Grupo Gigante*, "brand awareness" or "public association."[20] Neither of those phrases appear in *Grupo Gigante*'s discussion of prejudice. In the case at bar, the majority mistakenly contends that we did require these things.

We held in *Grupo Gigante* that laches barred equitable relief that would require the defendant to change the name on its existing stores.[21] First, we held that to obtain judicial enforcement of a trademark, a plaintiff "must conduct an *effective* policing effort"[22] and "[a]t the very least, that effort must involve actually contacting the alleged infringer about its use of a trademark."[23] Internet Specialties chose not to contact ISPWest during the 6 years that ISPWest developed its business around its trademark. In *Grupo Gigante*, as in this case, the larger firm gambled on the smaller firm's failure, so that it would not need to send a letter and deal with whatever discussion might ensue. We held that "the plaintiff 'cannot simply wait without explanation to see how successful the defendant's business will be and then ask for an injunction to take away the good will developed by defendant in the interim.' "[24] In other words, we should not cover the larger firm's losing bet.

---

[19] *Id.* (citing 5 *McCarthy on Trademarks and Unfair Competition* § 31:12 at 31-42 & n.4 (4th ed. 2002)).

[20] Majority Op. at 3413.

[21] *Grupo Gigante*, 391 F.3d at 1105.

[22] *Id.* at 1102 (citations omitted).

[23] *Id.*

[24] *Id.* at 1102-03 (*quoting* 5 *McCarthy on Trademarks and Unfair Competition* § 31:14 at 31-50 (4th ed. 2002)).

Our express holding on prejudice in *Grupo Gigante* cannot be reconciled with today's majority opinion.[25] The majority argues that in *Grupo Gigante*, prejudice was established because "[a] grocery store's very identity rests in its name."[26] I am not sure what the majority means by "very identity." The majority seems to be saying the brand name of a grocery store means more than the domain name of an Internet provider. For most of us, the grocery store we use has more to do with driving, parking, quality, selection, and price, than name. ISP-West's name appeared in their website address and customers' e-mail addresses and did not require parking or fresh tomatoes. A customer accesses ISPWest's website by entering the ISPWest domain name into their browser. A customer sends and receives email by way of "@ISPWest." No new driving directions are needed if the grocery store changes its name, but they are if ISPWest does. That ISPWest continued to build a valuable business while Internet Specialties delayed policing its mark for 6 years establishes prejudice under *Grupo Gigante*.[27]

We likewise applied laches in *E-Systems v. Monitek, Inc.*, where the defendant "incurred substantial advertising expenditures and rapidly expanded its business."[28] In *E-Systems*, the plaintiff sued the same year it discovered the infringement,[29] but was barred by laches because of the 6-year delay from when it should have known about the infringement, and the infringer was expanding rapidly and incurring substantial advertising expenses during those 6 years.[30]

---

[25]*Id.* at 1105 (citing 5 *McCarthy on Trademarks and Unfair Competition* § 31:12 at 31-42 & n.4 (4th ed. 2002)).

[26]Majority Op. at 3414-15.

[27]*Grupo Gigante*, 391 F.3d at 1105.

[28]720 F.2d 604, 607 (9th Cir. 1983).

[29]*Id.* at 606.

[30]*Id.*

Where the presumption of prejudice applies, as it does in this case and did in *Jarrow*, prejudice exists where an infringer is "forced to abandon its long-term investment in its presentation of [its product] to the public."**[31]** In *Jarrow Formulas*, we said that had the plaintiff "filed suit sooner, [the infringer] could have invested its resources in an alternative identity . . . in the minds of the public."**[32]** Likewise, had Internet Specialties sent a letter to ISPWest when it knew of the infringement, ISPWest would have had to deal with a name change for only 2,000 customers, not 13,000, and could have invested its resources in familiarizing the market and its customers with a new name. *Jarrow* quotes with approval Seventh Circuit language, that "investments to exploit [a market position with respect to the product at issue] are sufficient prejudice to warrant the application of laches."**[33]** Our decisions in *Tillamook* and *Whittaker Corp. v. Execuair Corp.* are to the same effect.**[34]**

The majority's new doctrine, that "[i]f this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay,"**[35]** cannot be reconciled with these cases or any others. The majority's only authority is a quote from a Seventh Circuit case, *Tisch Hotels, Inc. v. Americana Inn, Inc.*.**[36]** *Tisch* expressly distinguished "prolonged and inexcusable" delay,**[37]** which we have in the case at bar. The delay in *Tisch* was less than a year.**[38]** And, unlike this case, *Tisch* involved

---

**[31]***Jarrow*, 304 F.2d at 840.

**[32]***Id.* at 839.

**[33]***Id.* (*quoting Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999)).

**[34]***Tillamook*, 465 F.3d at 1108; *Whittaker Corp.*, 736 F.2d at 1347.

**[35]**Majority Op. at 3412.

**[36]**350 F.2d 609, 615 (7th Cir.1965).

**[37]***Tisch*, 350 F.2d at 615.

**[38]***Id.* at 610.

"deliberate infringement," where a cheaper hotel attempted to foist itself off as a luxury hotel by using the luxury hotel's name.[39] We would have also applied a presumption against laches in that case, whereas we apply a presumption in favor of laches here.[40]

Our authorities compel the conclusion that laches applies.

## B.  Injunctive relief

Even if laches did not bar the claim, the injunction would be an abuse of discretion. Reversing our decision in *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court held that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."[41] The Court held that a plaintiff seeking a preliminary injunction, as with a permanent injunction, "must establish . . . that an injunction is in the public interest."[42] The Court quoted with approval a remark we had made in an earlier panel decision in that case, which stayed the injunction because "[t]he district court did not give serious consideration to the public interest factor."[43]

Likewise in this case, the district court failed to give any consideration at all to the public interest. There are two different public interests at play in this case. One is the usual one in trademark law, avoidance of consumer confusion.[44] That interest has no force in this case, because we held in *Jarrow* that the interest in avoiding confusion defeats an application

---

[39]*Id.* at 610-11; 615.

[40]*Jarrow*, 304 F.3d at 835-36.

[41]*Winter v. NRDC, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 381 (2008), *rev'g* 518 F.3d 658 (9th Cir. 2008).

[42]*Id.* at ___, *Id..* at 374, 381-82.

[43]*Id.* at __, *Id.* at 378 (*quoting NRDC, Inc. v. Winter*, 502 F.3d 859, 863 (9th Cir. 2007)).

[44]*See Jarrow*, 304 F.3d at 841.

of laches "only when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being."[45] Accordingly, the majority's emphasis on "avoiding confusion to consumers" is inapplicable in this case.[46]

The second, and dispositive, public interest in this case is the burden imposed on the public by the injunction.[47] In this case, the injunction directed at ISPWest imposed the burden of changing e-mail addresses on 13,000 people. Probably tens of thousands more, who had the ISPWest's customers as correspondents, were left with obsolete e-mail addresses in their address books and mailing lists. The public has an interest in not being burdened with difficulties caused by a long-standing infringement it had nothing to do with. Failure to give that public interest any consideration at all makes the injunction an abuse of discretion. An injunction granted without consideration of the public interest must be vacated under *Winter*.[48]

ISPWest's growth from 2,000 customers to 13,000 customers occurred after Internet Specialties knew of the infringement but before the lawsuit. Had Internet Specialties diligently pursued its claim, around 11,000 customers and their many correspondents would not have come to rely on a stable e-mail address from ISPWest. This burden on the public is imposed not by the time a lawsuit takes,[49] but rather by Internet Specialties' delay in bringing the lawsuit or even writing a cease and desist letter. Thousands of individuals ought not be required to alert family, friends, business contacts, banks, listservs, and their online subscription providers of a change in e-mail address, all because of Internet Special-

---

[45]*Id.*

[46]Majority Op. at 3416.

[47]*See Winter*, ___ U.S. at ___, 129 S. Ct. at 377.

[48]*Id.*, at ___, 129 S.Ct. at 378-79.

[49]*See Jarrow*, 304 F.3d at 839.

ties' delay. An injunction without even weighing these burdens on the innocent is an abuse of discretion.[50]

The majority's evisceration of laches means that a big company can lurk in the tall grass while its little prey gradually fattens itself by dint of great effort and expense. Then, when the small competitor has succeeded, the big company can shake it down for a cut of its hard-won success, or destroy the name under which it innocently did business for years. That is trademark law as protection racket, rather than trademark law as prevention of consumer confusion.

---

[50]*Winter*, ___ U.S. at ___, 129 S.Ct. at 381-82.